**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

 ------------------------------------------------------------------------ X

Towaki Komatsu,

                        Plaintiff,

       -vs-

The City of New York, Bill de Blasio, James O'Neill, NYPD
Inspector Howard Redmond, NYPD Officer Andrew Berkowitz
(badge #: 7141), NYPD Detective Raymond Gerola (6577),
Ralph Nieves, Jessica Ramos, Shauna Stribula, NYPD Officer
Cruz (badge #: 751), NYPD Officer Baez (badge #: 5984), Jane
Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2
7/12/17, NYPD Officer Lance (Shield No. 246), Marco Carrion,

                        Defendants.

The defendants listed above who are people are being sued in
their individual and official capacities.

 ------------------------------------------------------------------------ X

<u>18-cv-3698</u>

**<u>Third Amended Complaint</u>**
**<u>About 7/12/17 Town Hall</u>**
**<u>Claims</u>**

**JURY DEMAND**

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege:

## NATURE OF ACTION

1. This pleading is to be treated as part of my consolidated third amended complaint in this action. Through this pleading, I seek to be granted immediate declaratory, injunctive, equitable, and other relief in response to illegal acts and omissions that have been committed and continue to be committed under the color of law in violation of my constitutional rights and other applicable laws that include New York State's Open Meetings Law. Such acts and omissions have been and continue to be an abuse of process comprised of standardless discretion, viewpoint discrimination, First Amendment retaliation, and selective-enforcement among other things that include a conspiracy to violate my constitutional rights at public forums and whistleblower retaliation.

2. Unless this Court finally intervenes and does so immediately to grant me declaratory, injunctive, and equitable relief that I seek through this pleading, the following irreparable and manifestly unjust harm will persist and worsen significantly very soon at the expense of the public's interest in ending the NYPD criminal mob's ability to continue to commit crimes with impunity, other government accountability, transparency, and fighting voter suppression, and voter fraud:

    a. I will continue to be illegally prevented from participating in public forums that are conducted by members of the public in a collaborative manner with New York City Mayor Bill de Blasio ("the Mayor") and other government officials in flagrant violation of my rights pursuant to the First Amendment, Fourth, Fifth, and Fourteenth Amendment, New York State's Open Meetings Law, NYPL §175.25, 18 U.S.C.

§245(b)(5), 18 U.S.C. §1513(e), NYPL §240.26, NYPL §240.20, NYPL §240.10, NYPL §240.65, and other applicable laws.

b.   The Mayor will continue his longstanding practice of being a liar and hypocrite while illegally and flagrantly engaging in and otherwise supporting illegal viewpoint discrimination, selective-enforcement, and prior restraints on fundamental First Amendment rights of New Yorkers with absolutely no valid justification nor proper due process accorded to New Yorkers prior to the imposition of practices that violate First Amendment freedoms that include the right to peaceful assembly in public forums irrespective of whether they are conducted by government officials. This refers to the following:

c.   It's objectively reasonable to believe that members of the NYPD's criminal mob will continue to criminally assault me in the presence of the Mayor and other members of the NYPD's mob at public forums that are partly conducted by the Mayor as neither the Mayor nor other members of that mob perform their Fourteenth Amendment affirmative legal duty to intervene on my behalf to protect my constitutional rights and such circumstances will prompt me to immediately take matters into my own hands by engaging in legal self-defense and disabling everyone who assault me.

3.   The violations of my rights to which I just referred violated my right to lawfully access, attend, participate in, and/or remain in the following public forums:

a.   A public town hall meeting that was a public forum that was conducted on 7/12/17 in the Bronx by members of the public in a collaborative manner with the Mayor, the New York City Council, and other government officials.

4.   My claims that this pleading concerns relate back to and amplify my existing claims in this

action for reasons that include the following:

    a.  The illegal acts and omissions that were committed against me on 7/12/17 were a continuation of the same series of transactions that my 4/27/17, 5/23/17, 6/8/17 claims concern insofar as that concerns an illegal denial by members of the Mayor's NYPD security detail, other members of the NYPD, and members of the Mayor's staff of my ability to **a)** access public forums at which the Mayor was present, **b)** remain standing precisely where I stood in a public forum without being illegally coerced to move by a member of the NYPD pursuant to my First Amendment right to lawful assembly, and **c)** engage in expressive association with other members of the public as they attended public forums that were conducted partly by the Mayor.

## PRELIMINARY REMARKS

1.  The following applies throughout this complaint in the interests of brevity:

    a.  Acronyms in the second column of the following table will be used throughout this affidavit instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | 374-page PDF file | The 374-page PDF file that I filed under seal in this action on 9/25/19 after having received it from the Mayor's office on 2/15/19 at 4:45 pm in an e-mail message in response to the FOIL demand that I submitted to it on 7/21/17 before it assigned the FOIL identification code of FOIL-2017-002-00687 to that FOIL demand. |
| 2 | Bronx DA | Bronx District Attorney's Office |
| 3 | CCRB | New York City Civilian Complaint Review Board |
| 4 | City Council | New York City Council |
| 5 | City Hall | New York City Hall |
| 6 | Defendant City | Defendant City of New York |
| 7 | DOI | New York City Department of Investigation |
| 8 | FOIL | Freedom of Information Law |
| 9 | FRCP | Federal Rule of Civil Procedure |
| 10 | HPD | New York City Department of Housing, Preservation & Development |

| 11 | HRA | The New York City Human Resources Administration |
|---|---|---|
| 12 | IAB | NYPD Internal Affairs Bureau |
| 13 | Judge Bannon | New York State Supreme Court Judge Nancy Bannon |
| 14 | The Mayor | New York City Mayor Bill de Blasio |
| 15 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted on 4/27/17 in a collaborative manner with the Mayor and other government officials in Queens |
| 16 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted on 5/23/17 in a collaborative manner with the Mayor and other government officials inside of the Bronx Supreme Court |
| 17 | Mayor's 6/8/17 town hall | The public town hall meeting that members of the public conducted on 6/8/17 in a collaborative manner with the Mayor and other government officials in Queens |
| 18 | Mayor's 7/12/17 town hall | The public town hall meeting that members of the public conducted on 7/12/17 in a collaborative manner with the Mayor and other government officials in the Bronx |
| 19 | Mayor's CAU | Mayor's Community Affairs Unit |
| 20 | Mr. Banks | HRA Commissioner Steven Banks |
| 21 | My HRA lawsuit | The parallel lawsuit I commenced against HRA in January of 2017 and filed with the New York State Supreme Court in Manhattan that was assigned the index number of 100054/2017. |
| 22 | My SAC | My Second Amended Complaint |
| 23 | My Urban lease | The apartment lease agreement that I signed with Urban on 2/16/16 in HRA's offices located at 33 Beaver Street in Manhattan with Lisa Lombardi of Urban to be issued sole possession of apartment 4C that is located in the building in which I reside |
| 24 | NTT | NTT Data, Inc. |
| 25 | OTDA | New York State Office of Temporary and Disability Assistance |
| 26 | Second Circuit | U.S. Court of Appeals for the Second Circuit |
| 27 | Urban | Urban Pathways, Inc. |

2. HRA is used in this pleading to refer to itself, the New York City Department of Homeless Services, and the New York City Department of Social Services that it is closely affiliated with.

3. All remarks that I make in this pleading that concern my efforts to have attended the Mayor's 7/12/17 town hall refer to the efforts that I made and objective that I had to have attended that town hall from within the room in which it was conducted as it was conducted and to remain in that room shortly after it ended to talk with government officials and others.

## PARTIES

1. I am the Plaintiff in this action, a U.S. Navy veteran, and I reside in the County of the Bronx, State of New York, and within this judicial district.

2. Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter.

3. Bill de Blasio is the Mayor of the City of New York. He is being sued in his official capacity as such as well as in his individual capacity.

4. The following were at all times relevant herein officers, employees, and agents of the NYPD and the City of New York:

   James O'Neill, Howard Redmond, Andrew Berkowitz (badge #: 7141), NYPD Detective Raymond Gerola (6577), Ralph Nieves, NYPD NYPD Officer Cruz (badge #: 751), NYPD Officer Baez (badge #: 5984), NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, NYPD Officer Lance (Shield No. 246)

5. At all times relevant herein, Defendant O'Neill was the NYPD's Commissioner.

6. Defendants O'Neill and Nieves have retired from the NYPD.

7. At all times relevant herein, Defendant Redmond helped to direct how the Mayor's NYPD security detail operates and held the rank of Deputy Inspector or Inspector in the NYPD.

8. The following defendants upon information and belief were at all times relevant herein members of the NYPD security detail for New York City Mayor Bill de Blasio while Defendant Redmond helped to direct it:

   Howard Redmond, Andrew Berkowitz (badge #: 7141), NYPD Detective Raymond Gerola (badge #: 6577), Ralph Nieves, NYPD John Doe2 7/12/17

9. The table shown next shows how the faces of defendants Jane Doe 7/12/17, NYPD John Doe1 7/12/17, and NYPD John Doe2 7/12/17 appear for identification purposes with respect to pseudonyms that I have used to identify them in this pleading

| # | Defendant with comments | Face |
|---|---|---|
| 1 | Jane Doe 7/12/17<br><br>She is shown with long brown hair and is wearing glasses while having a badge hanging from her neck.<br><br>She lied to me on 7/12/17 in the hallway in which I recorded that video as she claimed that I could not attend the public town hall meeting that the Mayor was conducting within the room in which it was being conducted because that room had reached its capacity and that it would be a fire hazard if I attended it in that room.<br><br>The image shown to the right is from a video that I recorded on 7/12/17 at 7:50 pm in a hallway in the building that hosted that town hall near the room in which it was conducted as it was being conducted. |  |

| 2 | NYPD John Doe 7/12/17 | |
|---|---|---|
| | He is shown wearing a blue shirt that says "NYPD COMMUNITY AFFAIRS" on its back.

He told me on 7/12/17 that there was nothing that he could do to enable me to attend the Mayor's 7/12/17 public town hall meeting as I talked with him in a hallway in the building that hosted that meeting as it was being conducted.

The image shown to the right is from a video that I recorded on 7/12/17 at 7:50 pm in a hallway in the building that hosted that town hall near the room in which it was conducted as it was being conducted. |  |

| 3 | NYPD John Doe2 7/12/17 |  |
|---|---|---|

10. The following were at all times relevant herein officers, employees, and agents of the City of New York:

   Jessica Ramos, Jane Doe 7/12/17, Marco Carrion, Shauna Stribula

11. At all times relevant herein, Marco Carrion and Shauna Stribula worked for the Mayor's CAU as Mr. Carrion was its Commissioner and Ms. Stribula issued work assignments to people who coordinated how members of the public were granted access to public town hall meetings that were conducted by them in a collaborative manner with the Mayor and other government officials while they were subject to New York State's Open Meetings Law

because of the precise manner in which they were conducted, those who attended them, and the sum and substance of what was discussed during them.

12. Jessica Ramos was employed by the City of New York and worked for the New York City Mayor's office at all times relevant herein. Ms. Ramos is now a New York State senator.

13. Ms. Ramos committed repeated acts of wire fraud, defamation, and abuse of process against me as a co-conspirator and faithless servant of Defendant City of New York to illegally cover-up illegal acts and omissions that were committed against me on 5/23/17, 4/27/17, and 6/8/17 that prevented me from attending the public resource fair and public town hall meetings that members of the public conducted in a collaborative manner with the Mayor and other government officials on those dates from within the room in which those public forums were conducted as they were conducted. Those public forums were subject to my constitutional rights, New York State's Open Meetings Law, and other applicable laws due to the precise manner in which they were conducted, the sum and substance of what was discussed during them, and those who attended them. As I discussed in detail in other pleadings that I have submitted in this action that are incorporated by reference as though fully set forth herein, Ms. Ramos blatantly and repeatedly lied about me to a whistleblower news censor in journalism named Erin Durkin. This is confirmed by e-mail messages that she sent to and received from Ms. Durkin on 6/28/17 and 6/29/17 that appear between pages 368 and 373 in the 374-page PDF file. Those e-mail messages establish that Ms. Ramos was a co-conspirator, criminal accomplice, and accessory after the fact with respect to both those who committed illegal acts and omissions against me on 4/27/17, 5/23/17, 6/8/17, and thereafter in relation to my efforts to have attended public forums that members of the public conducted in a collaborative manner with the Mayor and other government officials within the room in

which those public forums were conducted as they were conducted.

14. Upon information and belief, Jane Doe 7/12/17 worked for the Mayor's CAU and/or the New York City Mayor's office at all times relevant herein and was personally involved in granting and denying members of the public access to the room in which the Mayor conducted a public town hall meeting on 7/12/17 in the Bronx.

15. At all times relevant herein, the individual defendants named above that this pleading concerns were acting under the color of law in the course and scope of their duties and functions as agents, servants, employees, officers, contractors, and/or consultants of the City of New York and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.

16. At all times relevant herein, the individual defendants named above that this pleading concerns engaged in illegal acts and omissions that this pleading concerns as they **a)** intentionally and/or with a deliberate, callous, and wanton indifference to or a reckless disregard for the natural and probable consequences of their acts and **b)** without lawful justification oppressively caused me irreparable harm and damage in violation of my constitutional rights and other applicable laws.

17. The individual defendants are being sued herein in their individual and official capacities.

18. At all times relevant herein, the individual defendants were acting under color of law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD and Mayor at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers,

employees and agents of the NYPD.

19. The individual defendants' acts hereinafter complained of were carried out intentionally, oppressively, recklessly, and with malice and with egregious, callous, and wanton disregard of plaintiff's rights.

20. At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331 1343.

2. The claims that this pleading concerns raise federal questions under the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and under the following federal laws:

   28 U.S.C. §§ 2201 and 2202 (Declaratory Judgments); 42 U.S.C. §§ 1983, 1985, 1986, and 1988;

3. The claims that this pleading concerns also raise questions governed by laws of the State and City of New York State about which it is appropriate for this Court to exercise supplemental jurisdiction pursuant to 28 U.S.C. §1367 due to a common nucleus of operative fact and the interests of judicial economy.

4. It appears that this Court has the authority to adopt practices that were employed by the judge assigned to the case of *USA v. Donziger*, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) by similarly appointing private prosecutors to commence criminal prosecutions against the defendants that this pleading concerns in response to criminal acts that they committed and/or condoned that were committed against me to remedy the fact that prosecutors have

negligently refused to do so. I urge this Court to immediately adopt those practices for that purpose. Concerning this point, the claims that this pleading concerns also pertain to illegal acts and omissions that were committed against me that violated federal and New York State criminal laws that include, but aren't limited to 18 U.S.C. §245(b)(5), 18 U.S.C. §1513(e), 18 U.S.C. §1512, 18 U.S.C. §1519, 18 U.S.C. §241, NYPL §175.25, NYPL §240.26, NYPL §240.20, NYPL §240.10, NYPL §240.65,

5. Venue is proper pursuant to 28 U.S.C. §1391(b) because I am a resident of Bronx County in the State of New York.

6. This Court has authority to grant the requested injunctive relief under 28 U.S.C. §1343(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and plaintiffs' prayer for costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and 28 U.S.C. §1920.

7. Upon information and belief and consistent with the requirements of New York General Municipal Law § 50-e, I filed timely Notices of Claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law for most if not all of my claims that this pleading concerns. In the event that I may be incorrect about all or some of this, the City of New York has had sufficient knowledge about my claims in this pleading largely because I have testified about them in detail in public hearings that have been conducted by the City Council and Mayor. For this reason, in the event that I may have overlooked my need to file a notice of claim for claims that I am pursuing in this pleading, equity demands that this Court grant me leave to do so in a manner that does not delay my ability to pursue those claims in this action.

8. My claims have not been adjusted by the New York City Comptroller's Office.

## **LEGAL STANDARDS**

1. I incorporate the following by reference as though fully set forth herein:

    a. The proposed third amended complaint that is strictly for my 4/27/17 claims that I submitted in this action on 5/27/20 at 7:15 pm via e-mail by e-mailing it to Temporary_Pro_Se_Filing@nysd.uscourts.gov.

    b. The proposed third amended complaint that is strictly for my 5/23/17 claims that I submitted in this action on 5/14/20 at 3:30 pm via e-mail by e-mailing it to Temporary_Pro_Se_Filing@nysd.uscourts.gov.

    c. The proposed third amended complaint that is strictly for my 6/8/17 claims that I submitted in this action on 5/23/20 at 6:36 pm via e-mail by e-mailing it to Temporary_Pro_Se_Filing@nysd.uscourts.gov.

2. I seek for this Court to take judicial notice of and to fully uphold the information about legal standards that is presented in this section. What follows presents relevant findings from court decisions that include decisions that have been issued by the U.S. Supreme Court and Second Circuit that this Court is absolutely required to uphold.

3. Judge Gorenstein's decision in *Dolan v. Connolly*, No. 13 Civ. 5726 (GBD)(GWG) (S.D.N.Y. Mar. 2, 2017):

    "a court may "nonetheless treat the law as clearly established if decisions from [the Second Circuit] or other circuits clearly foreshadow a particular ruling on the issue." Terebesi v. Torreso, 764 F.3d 217, 231 (2d Cir. 2014)"

4. *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978):

    "the Constitution provides the press with no greater right of access to information than that possessed by the public at large"

5. *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 104 S. Ct. 1058, 79 L.

Ed. 2d 299 (1984):

> We have consistently adhered to the principle that government must "afford all points of view an equal opportunity to be heard."

6. *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999):

> "[a] public armed with information . . . is better able to detect" wrongdoing. See *id.,* at 67; see also *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "`Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " *Buckley v. Valeo, supra,* at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

7. *Kessler v. City of Charlottesville,* Civil Action No. 3: 17CV00056 (W.D. Va. Aug. 11, 2017):

> "("As to irreparable injury, it is well established that `[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion))."

8. *Skelos v. Paterson,* 25 Misc. 3d 347, 884 N.Y.S.2d 812 (Sup. Ct. 2009):

> "Because the timing of political speech is so important, it is irreparable harm to be deprived of freedom of political speech for even a minimal period of time (*Elrod v Burns,* 427 US 347 [1976]). "

9. *Healy v. James,* 445 F.2d 1122 (2d Cir. 1971):

> "In order to withstand constitutional attack, prior restraints must be narrowly drawn so as to suppress speech or assembly which presents a "clear and present danger" of a substantial evil."

10. *Citizens United v. Schneiderman,* 203 F. Supp. 3d 397 (S.D.N.Y. 2016):

> "A prior restraint on speech violates the First Amendment if it places "unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)."

11. *New York Times Co. v. United States,* 403 U.S. 713, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971):

> "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); see also *Near* v. *Minnesota,* 283 U. S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a

restraint." *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971). The District Court for the Southern District of New York in the *New York Times* case and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit in the *Washington Post* case held that the Government had not met that burden. We agree."

12. *Hoefer v. Board of Education of the Enlarged City School District Of Middletown*, No. 10

Civ. 3244 (ER) (S.D.N.Y. June 6, 2017):

"'"[s]uspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Nat'l Council of Arab Americans, Act Now to Stop War & End Racism Coal. v. City of N.Y.*, 478 F. Supp. 2d 480, 491 (S.D.N.Y. 2007) (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004))."

13. The following excerpts from *Ragbir v. Homan*, No. 18-1597 (2d Cir. Apr. 25, 2019) that

concern viewpoint discrimination and matters that qualify as being protected speech and of

public concern That excerpt also addresses retaliation for trying to attract news coverage

about a matter. Although not addressed in that case, matters about **a)** members of the NYPD,

and members of the Mayor's staff committing civil rights crimes comprised of voter fraud,

voter suppression, and whistleblower retaliation at public forums that the Mayor conducted

as used as campaign events to boost his re-election prospects in 2017; **b)** wage-theft that

substantially harm people during pandemics and otherwise; **c)** governments partnering with

companies that commit wage-theft that wage-theft victims and others are forced to fund; **d)**

fraud by government agencies and their business partners concerning publicly-subsidized

housing; and **e)** judicial misconduct are also matters of public concern. Whistleblowing about

such matters unquestionably is protected speech.

a    ""Ragbir's speech implicates the apex of protection under the First Amendment. His advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents. Thus, Ragbir's speech on a matter of "public concern"[22] is at "the heart of . . . First Amendment[] protection,"[23] and "occupies the highest rung of the hierarchy of First Amendment values,"' _Snyder v. Phelps,_ 562 U.S. 443, 451-52 (2011) (quoting _Connick v. Myers,_ 461 U.S. 138, 145 (1983); _Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,_ 472 U.S. 749, 758-59 (1985)). Because Ragbir's speech concerns "political change," it is also "core political speech" and thus "trenches upon an area in which the importance of First Amendment protections _is at its zenith._" _Meyer v. Grant,_ 486 U.S. 414, 421-22, 425 (1988) (emphasis added and internal quotation marks omitted). Indeed, his "speech critical of the exercise of the State's power lies at the very center of the First Amendment." _Gentile v. State Bar of Nev.,_ 501 U.S. 1030, 1034 (1991)."

b    ""It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." _Matal v. Tam,_ 137 S. Ct. 1744, 1765 (2017). "Such discriminat[ion] based on viewpoint is an `egregious form of content discrimination,' which is `presumptively unconstitutional.'"[24] _Id._ at 1766 (quoting _Rosenberger v. Rector & Visitors of Univ. of Va.,_ 515 U.S. 819, 829-30 (1995)). The Supreme Court has further described viewpoint discrimination as a "blatant" "violation of the First Amendment." _Rosenberger,_ 515 U.S. at 829.

Ragbir's plausible allegations and evidence, which we must accept as true at this juncture, support that the Government singled him out for deportation based not only on the viewpoint of his political speech, but on the public attention it received."

c    "A plausible, clear inference is drawn that Ragbir's public expression of his criticism, and its prominence, played a significant role in the recent attempts to remove him."

14.   The following excerpt from _Stauber v. City of New York_, No. 03 Civ. 9162 (RWS) (S.D.N.Y. July 16, 2004) confirms that the defendants bear the burden of establishing that acts and omissions in violation of my legal rights that they committed against me or otherwise condoned had an entirely valid legal justification:

Because a time, place, and manner restriction exists, the defendants "bear the burden of demonstrating that [it] is narrowly tailored to serve a significant governmental interest." Housing Works, Inc. v. Safir, 101 F. Supp. 2d 163, 170 (S.D.N.Y. 2000) (citing Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050, 1052 (2d Cir. 1983)). The defendants attempt to shift this burden by arguing that the

plaintiffs have shown no "First Amendment right to access information." Def.'s Post-Hearing Mem. at 13. However, it is the defendants that must show the law enforcement or public safety purposes that failing to provide access information serves.

Plaintiffs argue that defendants have not shown that the failure to provide access information serves any legitimate governmental interest, and is therefore not narrowly tailored.

> [T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

Ward, 491 U.S. at 799 (internal quotations and citations omitted).

15. *Hershey v. Kansas City Kansas Community College*, No. 2: 16-cv-2251-JTM (D. Kan. Feb. 17, 2017) that addressed viewpoint discrimination and a "standardless discretion" by government officials to deny access to a public forum that does not require a plaintiff to establish that he has been discriminated against with respect to gaining access to such a public forum because of his views. The following is a relevant excerpt from that decision:

> "As plaintiff points out, he has alleged that he was denied access to a public forum "for unstated reasons, in accordance with no policy, and at the absolute discretion of College officials." Dkt. 1, ¶ 50. He alleges that the College "has no policy to specify any standards by which College officials approve or deny requests," and that the College "vests absolute, standardless discretion in College officials" to allow or deny requests to use facilities for expressive activities. *Id.* ¶¶ 41, 42. Additionally, he alleges that the Board of Trustees and defendants Long and Wynn were acting as policymakers for the College at all relevant times. Finally, plaintiff has spelled out how a municipal policy or custom — in this instance, the *absence* of any standards governing exercise of discretion on requests to use College facilities — caused the deprivation of First Amendment rights alleged in the complaint.

> Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials. "A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a

particular point of view.'" *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 130 (1992) (cite omitted). Government regulation of access to a public forum must have definite standards because "if the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of ... First Amendment freedoms is too great to be permitted." *Id.* at 131 (internal quotation marks and citations omitted); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649 (1981) (awarding space on a first-come, first-served basis "is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.")

16. The following findings from Judge Schofield's decision in *Pen American Center, Inc., v. Trump*, No. 18-cv-9433 (LGS)(S.D.N.Y. Mar. 24, 2020) that addressed First Amendment retaliation and prior restraints imposed First Amendment rights that caused First Amendment injuries by chilling speech as well as the ability of others to receive speech from a speaker:

    a.  "a claim of specific present objective harm or a threat of specific future harm" to a speaker, with the effect of chilling speech, is sufficient for First Amendment standing"

    b.  "Defendant's retaliatory actions and threats have injured Mr. Acosta in two ways: (i) Mr. Acosta's own speech has been chilled, and (ii) Mr. Acosta's right to receive the speech of his press corps colleagues has been impeded, because their speech has been chilled. These are classic First Amendment injuries. *See Laird v. Tatum,* 408 U.S. 1, 13-14 (1972) (stating that, although claims of a "subjective chill" are insufficient, "a claim of specific present objective harm or a threat of specific future harm" to a speaker, with the effect of chilling speech, is sufficient for First Amendment standing); accord *Davis v New York State Bd. of Elections*, 689 Fed. App'x 665, 669 (2d Cir. 2017) (summary order); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976) ("[W]here a speaker exists," the First Amendment "necessarily protects the right to receive" the speech) (internal quotation marks omitted); accord *Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017).

The Complaint alleges that Mr. Acosta and the press corps have suffered an "objective harm [and] a threat of a specific future harm," *Laird*, 408 U.S. at 13-14, and that Mr. Acosta's resulting speech and receipt-of-information injuries are concrete, actual and particularized. Defendant has made an example of Mr. Acosta, by stripping his press credentials after he asked Defendant critical questions about the Administration, barring Mr. Acosta from the venue necessary to perform his job and directing the Press Secretary to warn other reporters that they would face similar consequences as Mr. Acosta. *See Nat'l Org. for Marriage, Inc. v. Walsh,*

714 F.3d 682, 689 (2d Cir. 2013) ("A plaintiff must allege something more than an abstract, subjective fear that his rights are chilled . . . but a real and imminent fear of such chilling is enough" based on the objective circumstances); *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (a chilling injury is established through "objective evidence" that "challenged conduct has deterred [a speaker] from engaging in protected activity"). The allegations furthermore suggest that Defendant punished Mr. Acosta publicly in order to chill his speech and the press corps'. In demonstrating that Defendant would in fact punish reporters who spoke critically, Defendant made his threats of future punishment more credible, and consequently, effective. The speech injuries are furthermore particular to Mr. Acosta. As a member of the press corps, and as a reporter specially targeted by Defendant, Mr. Acosta is uniquely vulnerable to Defendant's threats. He also has a unique interest in hearing the questions and discussion of his press corps colleagues with Defendant, which facilitate Mr. Acosta's own reporting.[2]"

17. *Walsh v. Enge*, 154 F. Supp. 3d 1113 (D. Or. 2015):

This case requires the Court to decide whether the First Amendment allows a Mayor or his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially indefinitely, from attending future City Council meetings to which the public is otherwise invited to attend and present their opinions simply because the person has been disruptive at previous meetings. The First Amendment protects, among other things, "freedom of speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I. The First Amendment is incorporated into the Fourteenth Amendment and thus applies to the states and local governmental bodies. *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has ever held that the First Amendment permits prospective exclusion orders from otherwise public city council meetings. A presiding officer may remove a disruptive individual from any particular meeting, and a sufficiently disruptive person may even be prosecuted for such conduct if public law permits. But no matter how many meetings of a city council a person disrupts, he or she does not forfeit or lose the future ability to exercise constitutional rights and may not be prospectively barred from attending future meetings. Our democratic republic is not so fragile, and our First Amendment is not so weak.

18. *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir. 1980):

"The right to a public forum for the discussion and interplay of ideas is one of the foundations of our democracy. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)."

19. *Schenck v. Pro-Choice Network of Western NY*, 519 U.S. 357, 117 S. Ct. 855, 137 L. Ed. 2d

1 (1997):

"We strike down the floating buffer zones around people entering and leaving the clinics because they burden more speech than is necessary to serve the relevant governmental interests. The floating buffer zones prevent defendants— except for two sidewalk counselors, while they are tolerated by the targeted individual—from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks. This is a broad prohibition, both because of the type of speech that is restricted and the nature of the location. Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum. See, *e. g., Boos* v. *Barry,* 485 U. S. 312, 322 (1988); *United States* v. *Grace,* 461 U. S. 171, 180 (1983)."

20. *Cohen v. California,* 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971):

   a. "Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, *e.g.*, *Organization for a Better Austin v. Keefe,* 402 U. S. 415 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e.g.*, *Rowan v. Post Office Dept.*, 397 U. S. 728 (1970), we have at the same time consistently stressed that "we are often `captives' outside the sanctuary of the home and subject to objectionable speech." *Id.*, at 738. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections."

   b. "it is nevertheless often true that one man's vulgarity is another's lyric."

   c. ""[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States,* 322 U. S. 665, 673674 (1944).

   Finally, and in the same vein, we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from

running the risk of opening the door to such grave results."

d. "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. See *Whitney v. California*, 274 U. S. 357, 375377 (1927) (Brandeis, J., concurring)."

21. *Barboza v. D'Agata*, 151 F. Supp. 3d 363 (S.D.N.Y. 2015):

"The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

22. *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017):

"Giving offense is a viewpoint. The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572"

23. *Abdullah v. County of St. Louis, Mo.*, 52 F. Supp. 3d 936 (E.D. Mo. 2014):

"Plaintiffs are entitled to the entry of a preliminary injunction enjoining defendants from telling citizens that they must keep moving, or from threatening them with arrest if they stand still, so long as those citizens are not committing a crime, engaging in violent acts, or participating in a crowd that contains other people doing those things."

24. Judge Schofield's decision in *Gonzalez v. City of New York*, No. 14 Civ. 7721 (LGS)

(S.D.N.Y. Sept. 29, 2016):

"Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is very limited."

25. *Meyers v. City of New York*, No. 1: 14-cv-09142 (ALC) (S.D.N.Y. Mar. 28, 2019):

"Under N.Y. Penal Law § 240.20(6), an officer's dispersal order is unlawful if it "was purely arbitrary and not calculated in any way to promote the public order." *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010); *Kass*, 864 F.3d at 212 (accord)."

26. *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012):

"a district court has authority to issue a broad injunction in cases where "a proclivity for unlawful conduct has been shown." *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable America, Inc.,* 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct "standing alone, would have been unassailable." *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 842 (6th Cir.1994) (internal quotation omitted)."

27. *Toy Manufacturers v. Helmsley-Spear*, 960 F. Supp. 673, 42 U.S.P.Q.2d 1203 (S.D.N.Y. 1997):

"It is well-established that "[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 390 (5th Cir.1977). *See generally* 4 McCarthy § 30:4 at 30-11 (explaining courts have power to enjoin "an act, which if done alone could be legal, but when performed in the context of a totality of acts does constitute unfair competition")."

28. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972):

"But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Cohen* v. *California,* 403 U. S. 15, 24 (1971); *Street* v. *New York,* 394 U. S. 576 (1969); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269-270 (1964), and cases cited; *NAACP v. Button,* 371 U. S. 415, 445 (1963); *Wood* v. *Georgia,* 370 U. S. 375, 388-389 (1962); *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949); *De Jonge* v. *Oregon* 299 U. S. 353, 365 (1937). To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan, supra,* at 270.

Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating

in public facilities. There is an "equality of status in the field of ideas,"[4] and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."

29. The following excerpts from *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) that is a decision that Judge Schofield cited in the decision that she issued in *Pen American Center, Inc., v. Trump*, No. 18-cv-9433 (LGS)(S.D.N.Y. Mar. 24, 2020):

    a.  "we acknowledged that this Court has referred to a First Amendment right to "receive information and ideas," and that freedom of speech " `necessarily protects the right to receive.'"

    b.  "Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here,[14] the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases."

30. *Trump v. Vance*, 591 S. Ct. (U.S. 2020):

    "the public has a right to everyman's evidence"

31. The following remark that former Second Circuit Judge Christopher Droney made about First Amendment rights in public forums that exist in such places as streets, sidewalks, and parks instead of the Internet during the oral arguments hearing that was conducted on 3/26/19 in *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2019) that was recorded at the elapsed time of 13 minutes and 2 seconds in the video recording that C-Span recorded of that hearing that is available on C-Span's web site at https://www.c-span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case:

    "For the First Amendment, it doesn't really have to be much more burdensome. If it's more burdensome at all, if you have to move down the street, that violates the First Amendment."

32. *US v. Turner*, 720 F.3d 411 (2d Cir. 2013):

    "Political speech, ugly or frightening as it may sometimes be, lies at the heart of our

democratic process." *Planned Parenthood II,* 290 F.3d at 1089 (Reinhardt, *J.,* dissenting); *see also Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.")

33. *Kaluczky v. City of White Plains*, 57 F.3d 202 (2d Cir. 1995):

"Voluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment. *See Piesco v. City of New York,* 933 F.2d 1149, 1158 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); *Bates,* 3 F.3d at 377. There are evident policy reasons for encouraging truthful testimony and for insulating witnesses from retribution or the threat of retribution. *See Piesco,* 933 F.2d at 1160 (recognizing the risks of being fired for truthful testimony, committing perjury, or being held in contempt for refusal to testify)."

34. *Piesco v. City of New York, Dept. of Personnel*, 933 F.2d 1149 (2d Cir. 1991):

a. A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

b. Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

c. "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

d. "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

e. "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

f. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes."

g. The "first amendment guarantees that debate on public issues is "`uninhibited, robust,

and wide open'".

    h.  Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

35. *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) that concerns the fact that the First

Amendment includes protection for the right to engage in expressive association with legal

observers, activists, journalists and others on sidewalks, streets, parks, public areas within

subway stations, public areas that exist inside of courthouses such as hallways and cafeterias,

and on the Internet during public hearings, public town hall meetings, public resource fair

meetings, curfews in which illegal selective-enforcement exists, demonstrations that include

protests, and other occasions:

> "Plaintiffs next argue that the searches and detentions violated their First Amendment right of freedom of expressive association. Plaintiffs unquestionably had a protected right to express themselves through association at the RIS Conference. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). As the Supreme Court observed in *Roberts,* the right of expressive association "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Id.*Participation in the RIS Conference — a social, religious, and cultural gathering — falls squarely within the forms of associational activity protected by the First Amendment."

36. *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770

(1959):

> "no man may take advantage of his own wrong"

37. *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980):

> "The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

38. *Sutera v. Transportation Security Administration*, No. 09-CV-2351 (E.D.N.Y. Apr. 29,

2010):

"An individual's substantive due process rights bar "some government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331 (1986). To prevail on a claim alleging a violation of substantive due process, a claimant must establish that the governmental conduct at issue was "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir. 1999) (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46, 118 S. Ct. 1708, 1716 (1998); *Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C. Cir. 1988)). In some contexts, a "fundamental procedural irregularity" may give rise to a substantive due process violation. *See id.* at 262 (citing *Creative Environments, Inc. v. Estabrook,* 680 F,2d 822, 832-33 (1st Cir. 1982))."

39. The following significant findings from *Higginbotham v. City of New York*, 105 F. Supp. 3d

369 (S.D.N.Y. 2015):

"[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *see also Houchins v. KQED*, Inc., 438 U.S. 1, 11, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (stating that "[t]here is an undoubted right to gather news `from any source by means within the law'"

40. *Nation Magazine v. US Dept. of Defense*, 762 F. Supp. 1558 (S.D.N.Y. 1991):

Regardless of whether the government is constitutionally required to open the battlefield to the press as representatives of the public, a question that this Court has declined to decide, once the government does so it is bound to do so in a non-discriminatory manner. *See Houchins,* 438 U.S. at 16, 98 S.Ct. at 2597; *American Broadcasting Co., Inc. v. Cuomo,* 570 F.2d 1080 at 1083 (2nd Cir. 1977).
Once a limited public forum has been created, the government is under an obligation to insure that "access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight,* 569 F.2d 124, 129 (D.C.Cir.1977); *see also Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975). Restrictions on newsgathering must generally be no more "arduous than necessary, and ... individual news[persons] may not be arbitrarily excluded from sources of information." *Sherrill,* 569 F.2d at 130; *see also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491-92, 95 S.Ct. 1029, 1044-45, 43 L.Ed.2d 328 (1975); *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943).

The seminal case suggesting the analysis by which to determine whether regulations are discriminatory is *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).[14] Above "all else," the Court wrote, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Id.* The *Mosley* Court invalidated a Chicago ordinance which barred picketing within 150 feet of a school but exempted "peaceful picketing of any school involved in a labor dispute." *Id.* at 93, 92 S.Ct. at 2288. Once a

forum is opened to assembly, speaking or observation by some groups, the government may not limit access to others who may express controversial or less favored views. *Id.* at 96, 92 S.Ct. at 2290. Furthermore, the government "may not select which issues are worth discussing or debating." *Id.* There is, the Court wrote, "an equality of status in the field of ideas" and the government must afford all points of view an equal opportunity to be heard. *Id.*

In focusing on the equality of all points of view, the *Mosley* Court was not concerned about whether the restricted speech was harmful or offensive to listeners such that its suppression was justified. Rather, the basis for invalidating the ordinance was its underinclusive character. The Court held that by limiting the voices that could be heard at the stairs of the school door to those involved in a labor dispute, the government was deciding what information was of value to the American people. This, the Court concluded, was a content-based determination which is impermissible under the First Amendment. As one commentator has suggested, the key issue in *Mosley* "is whether the government may constitutionally restrict *only* the speech restricted." Stone, *Content Regulation and the First Amendment* 25 Wm. & Mary L.Rev. 189, 203 (1983); *see also Erznoznik v. Jacksonville,* 422 U.S. 205, 208-12, 95 S.Ct. 2268, 2272-74, 45 L.Ed.2d 125 (1975); *Widmar v. Vincent,* 454 U.S. 263, 267-77, 102 S.Ct. 269, 273-78, 70 L.Ed.2d 440 (1981).

41. *Al-Amin v. City of New York*, 979 F. Supp. 168 (E.D.N.Y. 1997).

"[W]hether particular conduct possesses sufficient communicative elements to bring the First Amendment into play" depends on "whether `[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Spence v. Washington,* 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (quoted in *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989)). Under this standard, activities such as flag-burning, *Texas,* 491 U.S. at 405-06, 109 S.Ct. at 2540, wearing an armband to protest the Vietnam War, *Tinker v. Des Moines Independent Community Sch. Dist.,* 393 U.S. 503, 505, 89 S.Ct. 733, 735-36, 21 L.Ed.2d 731 (1969), and a sit-in to protest segregation, *Brown v. Louisiana,* 383 U.S. 131, 141-42, 86 S.Ct. 719, 723-24, 15 L.Ed.2d 637 (1966), have been recognized as expressive behavior that warrants First Amendment protection. The fundamental characteristic of these cases is that "the conduct and the expression were inextricably joined." *Young v. New York City Transit Authority,* 903 F.2d 146, 153 (2d Cir.) (First Amendment implicated if regulated activity is "inseparably intertwined with a `particularized message'"), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990)."

42. The following extremely well-reasoned and significant findings about due process insofar as

First Amendment, Fifth Amendment, and Fourteenth Amendment rights are concerned that

are from *Karem v. Trump*, No. 19-CV-5255 (D.C. Cir. June 5, 2020) and cite findings that

were issued by the U.S. Supreme Court:

> Karem raises a host of challenges to the suspension of his hard pass, including that he lacked fair notice of the proscribed conduct; that the professionalism standard permitted discriminatory enforcement; that the White House failed to hand over key evidence; that Grisham predetermined the proceeding's outcome; that the suspension constituted veiled content- and viewpoint-based punishment; and, lastly, that "nothing provided [him] with notice of the severity of the penalty that might be imposed" for his purportedly unprofessional conduct. Appellee's Br. 35 (internal quotation marks omitted). We begin—and end—with Karem's final argument.

> "A fundamental principle in our legal system," the Supreme Court observed in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id.* at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." *Id.* at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).

> That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S. at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.

> Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

43. *Frain v. Baron*, 307 F. Supp. 27 (E.D.N.Y. 1969) that cites a controlling U.S. Supreme Court

decision:

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

44. The following significant findings from *Calicchio v. Sachem Central School District*, No. 14-

CV-5958 (DRH)(SIL) (E.D.N.Y. Jan. 17, 2020):

> Substantive due process rights safeguard persons "against the government's `exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998)). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill advised." *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995) (internal quotation marks omitted). Se*e Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994). To state a Substantive Due Process claim, plaintiffs must allege (1) a valid liberty or property interest, and (2) defendants infringed on that interest in an arbitrary or irrational manner. *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir. 2001); *Natale v. Town of Ridgefield,* 170 F.3d 258, 262 (2d Cir.1999) ("For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels `arbitrary' and `outrageous.'").

45. *Doe v. City of New York*, No. 18-cv-670 (ARR)(JO) (E.D.N.Y. Jan. 9, 2020):

> "Finally, "[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995) (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the police without reprisal" is "clearly" an "interest protected by the First Amendment," *Kerman v. City of New York,* 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill,* 482 U.S. 451, 461 (1987)). Thus, on summary judgment, the Second Circuit has held that a plaintiff established a First Amendment retaliation claim when he proffered facts showing that police officers retaliated against him for making derogatory comments to the officers and for threatening to sue them. *Kerman,* 261 F.3d at 241-42.[3]"

46. The following excerpts from *Capogrosso v. Gelbstein*, No. 18-CV-2710 (MKB)(LB)

(E.D.N.Y. Sept. 25, 2019) that address First Amendment retaliation claims in relation to

temporal proximity between protected speech and adverse treatment that followed 7 weeks

later:

a.  "The First Amendment protects "the right of the people . . . to petition the
    government for the redress of grievances." U.S. Const. amend. I. "The right to
    petition is . . . implicit in `[t]he very idea of [republican] government," _McDonald v.
    Smith,_ 472 U.S. 479, 482 (1985) (quoting _United States v. Cruikshank,_ 92 U.S. 542,
    552 (1876)), and "allows citizens to express their ideas, hopes, and concerns to their
    government and their elected representatives," _Borough of Duryea, Pa. v.
    Guarnieri,_ 564 U.S. 379, 388 (2011). "A petition conveys the special concerns of its
    author to the government and, in its usual form, requests action by the government to
    address those concerns." _Id._ at 388-89. Because "speech critical of the exercise of the
    State's power lies at the very center of the First Amendment," _Velez v. Levy,_ 401 F.3d
    75, 97 (2d Cir. 2005) (quoting _Gentile v. State Bar of Nev.,_ 501 U.S. 1030, 1034
    (1991)), "`a section 1983 claim will lie where the government takes negative action
    against an individual because of his exercise of rights guaranteed' by the First
    Amendment," _Velez,_ 401 F.3d at 97 (quoting _Friedl v. City of New York.,_ 210 F.3d
    79, 86-87 (2d Cir. 2000)); _see also Safepath Sys. LLC v. N.Y.C. Dep't of Educ.,_ 563 F.
    App'x 851, 857 (2d Cir. 2014) ("The rights to complain to public officials and to seek
    administrative and judicial relief from their actions are protected by the First
    Amendment." (quoting _Dougherty v. Town of N. Hempstead Bd. of Zoning
    Appeals,_ 282 F.3d 83, 91 (2d Cir. 2002)).

    Plaintiff plausibly alleges that he engaged in protected speech. Plaintiff alleges that he
    was banned from the TVB courts in response to his March 2015 Complaint to
    Morgan in her capacity as an Assistant Attorney General in the New York State
    Office of the Attorney General.[10] "

b.  "The second element of a First Amendment retaliation claim requires a plaintiff to
    show that "the defendant's actions were motivated or substantially caused" by the
    plaintiff's First Amendment activity. _Dorsett,_ 732 F.3d at 160. "A plaintiff may
    establish causation either directly through a showing of retaliatory animus, or
    indirectly through a showing that the protected activity was followed closely by the
    adverse action." _Smith v. Cty. of Suffolk,_ 776 F.3d 114, 118 (2d Cir.
    2015) (citing _Cobb v. Pozzi,_ 363 F.3d 89, 108 (2d Cir. 2004)); _see also Hampshire
    Recreation, LLC v. Vill. of Mamaroneck,_ 664 F. App'x 98, 100 (2d Cir.
    2016) (holding, in First Amendment retaliation case, that a "causal connection [is]
    established where protected activity is closely followed in time by [an] adverse
    action" (internal quotation marks omitted) (quoting _Cifra v. Gen. Elec. Co.,_ 252 F.3d
    205, 217 (2d Cir. 2001))); _Gogol v. City of New York,_ No. 15-CV-5703, 2017 WL
    3449352, at *9 (finding, in a First Amendment retaliation case, that "temporal
    proximity is strong evidence of improper intent" (citation omitted)). "[D]irect
    evidence of retaliation may consist of `conduct or statements by persons involved in
    the decision[-]making process that may be viewed as directly reflecting the alleged
    [retaliatory] attitude.'" _McAvey v. Orange-Ulster BOCES,_ 805 F. Supp. 2d 30, 40
    (S.D.N.Y. 2011) (alteration in original) (citation omitted) (quoting _Lightfoot v. Union
    Carbide Corp.,_ 110 F.3d 898, 913 (2d Cir. 1997)). The Second Circuit "has declined

to draw a bright line as to how close in time the [protected activity and the adverse action] must be" to establish the causation element of a First Amendment retaliation claim, and has "instead called on courts to exercise `judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.'" _Brandon,_ ___ F.3d at ___, 2019 WL 4263361, at *14 (quoting _Espinal v. Goord,_ 558 F.3d 119, 129 (2d Cir. 2009))."

For purposes of the motion to dismiss, Plaintiff has established a causal link between his protected First Amendment activity and the State Defendants' actions banning him from the TVB courts. Plaintiff alleges that on May 8, 2015, seven weeks after Plaintiff sent the March 2015 Complaint, Gelbstein and Calvo approached him at the Brooklyn South Office of the TVB. (Compl. ¶ 10.) Gelbstein then stated, "[c]an't you go practice somewhere else[.] I saw what you wrote about me that I am complicit and incapable," (_id._) — comments that not only indicate that Gelbstein and Calvo were aware of Plaintiff's letter and its contents, but that also "may be viewed as directly reflecting the alleged [retaliatory] attitude," _McAvey,_ 805 F. Supp. at 40. Three days later, on May 11, 2015, Plaintiff was approached by Smart, who "attempt[ed] to provoke . . . Plaintiff into a physical confrontation." (_Id._ ¶ 11.) Despite Plaintiff's "refus[al] to engage" in a physical confrontation with Smart, Plaintiff was then approached by Calvo, who asked him to leave the building and informed him that he was no longer allowed at any TVB locations."

47. _Dolan v. Connolly_, No. 13 Civ. 5726 (GBD)(GWG) (S.D.N.Y. Mar. 2, 2017):

"An "official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations in original) (internal quotation marks omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The Second Circuit has held "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was *16 unlawful.'" Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004) (alterations in original) (quoting Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003)). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know about the constitutionality of the conduct." Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 255 (2d Cir. 2014) (alteration in original) (internal quotation marks omitted) (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)); accord Luna, 356 F.3d at 490 (quoting McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999); and citing Anderson, 483 U.S. at 640).

Even if there is not a case directly on point saying particular conduct is prohibited, a court may "nonetheless treat the law as clearly established if decisions from [the Second Circuit] or other circuits clearly foreshadow a particular ruling on the issue."

Terebesi v. Torreso, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks omitted) (quoting Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010)). The degree to which such foreshadowing must occur has been articulated by the Supreme Court in recent decisions. Thus, in White v. Pauly, 2017 WL 69170 (U.S. Jan. 9, 2017), the Court emphasized:

> [5] We reject defendants' argument that Taylor v. Barkes, 135 S. Ct. 2042 (2015), "indicate[s] that only Supreme Court precedent, not circuit precedent, can establish clearly established law for qualified immunity purposes." Defs. Reply at 12. The passage defendants cite from Taylor, 135 S. Ct. at 2044, does not support defendants' argument. And to our knowledge the Supreme Court has never so held.

> "'[E]xisting precedent must have placed the statutory or constitutional question beyond debate.'" [Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)]. In other words, immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Ibid. . . . "[C]learly established law" should not be defined "at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)."

48. The following is a pertinent excerpt from *Green v. Westchester County*, No. 18-cv-09167 (NSR) (S.D.N.Y. June 20, 2019) that confirms that both unofficial and official policies by Defendant City may suffice for establishing *Monell* liability for municipal liability claims.

> Further, "both official and unofficial policies may suffice for establishing *Monell* liability. For an unofficial policy or custom to invite *Monell* liability, the practice, custom or usage must be so widespread and so persistent that it has the force of law." *DiPippo v. Cty. of Putnam,* No. 17-CV-7948 (NSR), 2019 WL 1004152, at *8 (S.D.N.Y. Feb. 28, 2019).

49. The following pertinent excerpts from *Doe v. City of New York,* No. 15-CV-0117 (AJN) (S.D.N.Y. Sept. 28, 2018) that address municipal liability and deliberate indifference by government officials about violations of constitutional rights:

> "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). In other words, "municipalities are `responsible only for their own illegal acts,' and cannot be held `vicariously liable under § 1983 for their employees' actions.'" *Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick*

*v. Thompson,* 563 U.S. 51, 60 (2011)). To sustain a *Monell* claim, a plaintiff "must prove that `action pursuant to official municipal policy' caused the alleged constitutional injury." *Id.* (quoting *Connick,* 563 U.S. at 60).

A municipal policy may be "pronounced or tacit and reflected in either action or inaction." *Id.* at 334. With respect to the latter category, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution," *Id.* (quoting *Connick,* 563 U.S. at 61-62). Thus, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a `deliberate choice,' that acquiescence may `be properly thought of as a city policy or custom that is actionable under § 1983.'" *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of Canton,* 489 U.S. at 388). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir. 1996). Indeed, failure to "carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced," *City of St. Louis v. Praprotnik,* 485 U.S. 112, 131 (1988). Deliberate indifference may be proven through "proof of repeated complaints of civil rights violations" if "the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995). Such claims put the City on notice even if the complaints are ultimately not meritorious, *Fiacco v. City of Rensselaer,* 783 F.2d 319, 328 (2d Cir. 1986). "Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was `contrary to the practice of most . . . departments' and was `particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated" *Vann,* 72 F.3d at 1049."

50. The following findings from *Adebiyi v. City of New York,* No. 13-CV-380 (WFK)(CLP)(E.D.N.Y. Sep. 30, 2014) that address the legal standard that applies to proving conspiracies to violate civil rights:

> ""To sustain a claim for conspiracy under § 1983, a plaintiff must demonstrate that **a defendant acted in a `willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated the plaintiffs rights . . . secured by the constitution or the federal courts**.'" *Morpugo v. Incorporated Vill. of Sag Harbor,* 697 F. Supp. 2d 309, 331 (E.D.N.Y. 2010) (Seybert, J.) (citing *Maish v. Corr. Officer Austin,* 901 F. Supp. 757, 765 (S.D.N.Y. 1995) (Koeltl, J.))."

> (boldface formatting added for emphasis)

51. The following excerpt from *US v. Basey,* 816 F.2d 980 (5th Cir. 1987) that addresses the guilt of those who participate in conspiracies:

"Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan,* 578 F.2d 121, 122-23 (5th Cir.1978)."

52. The following excerpt from *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) that presents a

    useful discussion about co-conspirators in conspiracies:

    "This court has several times observed that statements "that apprise a coconspirator of the progress of a conspiracy," *United States v. Rahme,* 813 F.2d 31, 36 (2d Cir.1987), or that "brief [a coconspirator] on the scheme," *United States v. Mangan,* 575 F.2d 32, 44 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), are statements made in furtherance of a conspiracy. *See United States v. Paone,* 782 F.2d 386, 391 (2d Cir.1986), *cert. denied,* ___ U.S. ___, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). *See also United States v. Persico,* 832 F.2d 705, 716 (2d Cir.1987). The Third Circuit has likewise observed that statements by coconspirators that "inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." *United States v. Ammar,* 714 F.2d 238, 252 (3d Cir.) (citations omitted), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)."

53. The following excerpts from *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999) that

    address conspiracies and how they may be proven:

    a.  "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

    b.  "While "conclusory allegations" of a § 1983 conspiracy are insufficient, *Dwares v. City of New York,* 985 F.2d 94, 99-100 (2nd Cir.1993) (citing cases), we have recognized that such "conspiracies are by their very nature secretive operations," and may have to be proven by circumstantial, rather than direct, evidence. *Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir.1994)."

    c.  "while "futility" is a valid reason for denying a motion to amend, *John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994), this is true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991)"

54. The following excerpt from *Jutrowski v. TP. of Riverdale*, 904 F.3d 280 (3d Cir. 2018):

> "where a plaintiff adduces sufficient evidence of an after-the-fact conspiracy to cover up misconduct, even of an unidentified officer, he may be able to state a claim under § 1983 for the violation of a different constitutional right: the due process right of access to the courts."

55. The following findings from *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), *Nicholas v. Bratton*, No. 15-CV-9592 (JPO) (S.D.N.Y. Mar. 26, 2019) and *Williams v. City of New York*, No. 16-CV-8193 (VSB) (S.D.N.Y. Sept. 10, 2018) that address the use of fraudulent pretexts in furtherance of a scheme to engage in mendacity and violate the legal rights of others:

   a. *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007):

> The videotape tells quite a different story. There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit.[6] We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.[7]
>
> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). **When opposing parties tell two different stories, one of which is blatantly**

**contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.**

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

(boldface formatting added for emphasis)

b. *Nicholas v. Bratton*, No. 15-CV-9592 (JPO) (S.D.N.Y. Mar. 26, 2019):

"[C]ourts must [always] be cognizant of disguised attempts to refuse the fullest scope of free speech allegedly based on governmental concerns such as safety." *Tunick v. Safir*, No. 99 Civ. 5053, 1999 WL 511852, at *7 (S.D.N.Y. July 19, 1999), *aff'd*, 228 F.3d 135 (2d Cir. 2000) (per curiam). Here, "there are disputed issues of fact regarding whether the City's purported justifications for denying Plaintiff[]" access to the street adjacent to the ambulance are being used as "pretext for content based discrimination." *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 494 (citing *Olivieri*, 801 F.2d at 606, for proposition "that issues of fact regarding whether purported justifications are pretextual may warrant a trial on the merits"). Because a reasonable jury could conclude that Davis and DeBonis unjustifiably treated Nicholas differently from the fire buffs or from the City's own press officials for content-based reasons, summary judgment cannot be granted to them on the question of their having provided equal access to the scene of the emergency rescue to all newsgatherers without reference to content.

c. *Williams v. City of New York*, No. 16-CV-8193 (VSB) (S.D.N.Y. Sept. 10, 2018):

"However, assuming these facts to be true, drawing all inferences in Plaintiff's favor, and viewing these facts in the context of the alleged scheme to manufacture pretext to terminate Plaintiff, it is plausible that those personnel decisions were driven by discriminatory animus. At this stage, I decline to dismiss Plaintiff's action, and will permit further development of the facts through discovery."

56. The following findings from *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) that address mendacity and fraudulent pretexts in the following way:

"A "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."

57. The following findings from *Regional Economic Community v. City of Middletown*, 294 F.3d

35 (2d Cir. 2002) that confirm that discriminatory intent and animus may be inferred from

the totality of the circumstances and other factors:

> "Discriminatory intent may be inferred from the totality of the circumstances, including
> ... the historical background of the decision ...; the specific sequence of events leading up
> to the challenged decision ...; [and] contemporary statements by members of the
> decisionmaking body...." *LeBlanc*, 67 F.3d at 425 (citations and internal quotation marks
> omitted)."
> a.

58. The following findings from *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72 (2d

Cir. 2015) that also **a)** confirm that discriminatory intent and animus may be inferred from

the totality of the circumstances and other factors and **b)** concern the right to engage in

discovery in litigation to establish discriminatory intent and the existence fraudulent pretexts:

> "Second, in making the plausibility determination, the court is to "draw on its judicial
> experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Of course, the
> court must proceed at all times in a fair and deliberative fashion, alert to any unconscious
> bias that could affect decisionmaking.[9] In making the plausibility determination, the
> court must be mindful of the "elusive" nature of intentional discrimination. *See Burdine*,
> 450 U.S. at 255 n. 8, 101 S.Ct. 1089. As we have recognized, "clever men may easily
> conceal their motivations." *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d
> Cir.1979) (internal quotation marks omitted). Because discrimination claims implicate an
> employer's usually unstated intent and state of mind, *see Meiri v. Dacon*, 759 F.2d 989,
> 998 (2d Cir.1985), rarely is there "direct, smoking gun, evidence of discrimination,"
> *Richards v. N.Y.C. Bd. of Educ.*, 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd*, 842 F.2d
> 1288 (2d Cir.1988). Instead, plaintiffs usually must rely on "bits and pieces" of
> information to support an inference of discrimination, *i.e.*, a "mosaic" of intentional
> discrimination. *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir.1998), *abrogated in part
> on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141
> L.Ed.2d 633 (1998). Again, as we made clear in *Littlejohn*, at the initial stage of a
> litigation, the plaintiff's burden is "minimal" — he need only plausibly allege facts that
> provide "at least minimal support for the proposition that the employer was motivated by
> discriminatory intent." 795 F.3d at 311, 2015 WL 4604250, at *8."

59. The following findings from _Duncan v. Sullivan County_, No. 18 CV 9269 (VB) (S.D.N.Y. Mar. 2, 2020) address personal involvement in deprivations of constitutional rights and supervisory liability:

> "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994). "The Second Circuit has defined `personal involvement' to mean direct participation, such as `personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as `ordering or helping others to do the unlawful acts.'" Leneau v. Ponte, 2018 WL 566456, at *14 (S.D.N.Y. Jan. 25, 2018) (quoting Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001)).
>
> Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.
>
> Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).[2]

60. The following findings from _Wright v. Musanti_, No. 14-cv-8976 (KBF) (S.D.N.Y. Jan. 20, 2017) that address punitive damages, the legal definition of assault in New York State, and the fact that an initial aggressor is liable for all subsequent hostilities that arise between two or more parties:

| a | "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 n.9 (1986); see also Loughry v. Lincoln First Bank, N.A., 494 N.E.2d 70, 74 (N.Y. 1986) (explaining that punitive damages "serve the societal purposes of punishing and deterring the wrongdoer, as well as others, from similar conduct in the future.") (citation omitted). Under New York law, "the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases", Marinaccio v. Town of Clarence, 986 N.E.2d 903, 906 (N.Y. 2013), such as those "involving `gross, wanton, or willful fraud or other morally culpable conduct'", Action S.A. v. Marc Rich & Co., 951 F.2d 504, 509 (2d Cir. 1991) (quoting Borkowski v. Borkowski, 355 N.E.2d 287, 287 (N.Y. 1976)); see also Marinaccio, 986 N.E.2d at 906 (noting |

that "the conduct justifying [a punitive damages] award must manifest `spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton'" (quoting Dupree v. Giugliano, 982 N.E.2d 74, 76 (N.Y. 2012)); Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 196 (N.Y. 2007) ("Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but `evince[s] a high degree of moral turpitude and demonstrate[s] such a wanton dishonesty as to imply a criminal indifference to civil obligations") (quoting Walker v. Sheldon, 179 N.E.2d 497, 499 (N.Y. 1961)).

Although the factfinder has discretion to determine whether to award punitive damages and, if so, in what amount, Nardelli v. Stamberg, 377 N.E.2d 975, 977 (N.Y. 1978), punitive damages must "bear some reasonable relation to the harm done and the flagrancy of the conduct causing it". Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 886 N.E.2d 127, 131 (N.Y. 2008) (citation omitted). In arriving at the appropriate amount, the factfinder may consider the defendant's financial circumstances. Brink's Inc v. City of N.Y., 717 F.2d 700, 706-07 (2d Cir. 1983)("Under New York law, evidence of a defendant's wealth is admissible on the issue of the amount of punitive damages.") (citations omitted); see also Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd., 891 F. Supp. 935, 945 (S.D.N.Y. 1995); Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 267-68 (S.D.N.Y. 1999).

Here, the Court finds that defendant's conduct reflects the sort of willful disregard of the interests of others that justifies imposing punitive damages, see, e.g., Marinaccio, 986 N.E.2d at 906, both as a general and specific deterrent, see Memphis Cmty. Sch. Dist., 477 U.S. at 306 n.9. A $10,000 award is appropriate here. In arriving at this amount, the Court considers the financial circumstances of defendant, as it is entitled to do. See Brink's Inc., 717 F.2d at 706-07; Softel, Inc., 891 F. Supp. at 945; Greenbaum, 67 F. Supp. 2d at 267-68. At trial, the Court specifically questioned defendant regarding her financial circumstances for the stated purpose of identifying an appropriate amount of punitive damages to impose, if any. (See Tr. 80:10-84:25.) The Court repeatedly invited defendant to bring any information she thought might be relevant to the Court's attention. (Id. 83:20-84:25.) During the course of that exchange, defendant testified regarding her and her husband's salaries, as well as their family planning, and primary assets and debts, as described below.

| b | "Under New York law, "`[a]n `assault' is an intentional placing of another person in fear of imminent or offensive contact.'" Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)); Farash v. Cont'l Airlines, Inc., 337 F. App'x 7, 9-10 (2d Cir. 2009) (same). "The plaintiff must show that the defendant intended `either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'" |

| c | "Under these circumstances, defendant's kick clearly altered the tenor of the parties' interaction, shifting the encounter from an ordinary, nonaggressive interaction between two pedestrians to something more akin to a street brawl. As a result, defendant served as the initial aggressor at the outset of the encounter, rendering her liable to plaintiff for all ensuing assaults and batteries" |
|---|---|

61. The following related findings from the Second Circuit's decision in _Wright v. Musanti_, 887

F.3d 577 (2d Cir. 2018) that confirm that total household income may be used to calculate

punitive damages:

> "Musanti also argues that the district court improperly considered her husband's salary and assets when determining the amount of punitive damages. In awarding $10,000 in punitive damages, the court considered Musanti's testimony that she had virtually no income, that her husband made around $65,000 a year, that the couple owned a home and two cars, and that her husband had debt in the form of student loans. The court's opinion makes clear that it seriously considered the amount of punitive damages to award, including requesting financial documents from Musanti, which Musanti failed to provide. New York law permits the fact finder to consider evidence of a defendant's wealth when setting the amount of punitive damages, in order to determine what amount would be sufficient to punish that particular defendant and deter "others of similar mind." _Rupert v. Sellers,_ 48 A.D.2d 265, 368 N.Y.S.2d 904, 910 (4th Dep't 1975). Musanti presents no authority to support her assertion that consideration of her entire household's income and assets was improper."

62. The following findings from _People v. Alba_, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App. Div.

1981) that address what it means to be arrested and confirms that people may be arrested

even when they are not officially under arrest:

> "The majority finds that, although defendant was told that he was "under arrest", no arrest, in fact, took place. We disagree. "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment". (_People v Cantor_, 36 NY2d, at p 111; see _Terry v Ohio_, 392 US, at p 16.)"

63. The following findings from _Dotson v. Farrugia_, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26,

2012) that reinforce the preceding findings from _People v. Alba_:

> ""A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally

applied." *Brendlin v. California*, 551 U.S. 249, 254 (internal quotations marks and citations omitted) (emphasis in original); see also Terry, 392 U.S. at 19 n.16 ("Obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred.")."

64. The following excerpts from *People v. Howard*, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408

N.E.2d 908 (1980) that clearly confirms that people have a right to be left alone by law-

enforcement personnel when they are conducting themselves in a lawful manner:

| a | "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away." |
|---|---|

| b | "But while the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment to the United States Constitution and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause. As Mr. Justice BRANDEIS put it long ago in *Olmstead v United States* (277 US 438, 478), defendant had "the right to be let alone.""" |
|---|---|

65. The following is the plain text of New York City Charter §1116:

a. Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in addition to the penalties imposed by law and on conviction shall forfeit such office or employment, and be excluded forever after from receiving or holding any office or employment under the city government.

b. Any officer or employee of the city or of any city agency who shall knowingly make a false or deceptive report or statement in the course of duty shall be guilty of a misdemeanor and, upon conviction, forfeit such office or employment.

66. Upon information and belief, all employees of the City of New York are required to submit

and oath of affirmation upon beginning such employment in which the pledge to perform

their duties in such jobs to the best of the abilities and in accordance with the U.S. and New York State Constitution.

67. The public town hall meeting that members of the public conducted on 7/12/17 in the Bronx with New York City Councilman Fernando Cabrera, the Mayor, Mr. Banks, and other government officials was a mostly traditional public forum that was governed by New York State's Open Meetings Law. That public forum was conducted in a school named Creston Academy that is located at 2160 Morris Avenue. How that public forum was arranged and the extent to which access to the room in which that public forum was conducted as it was conducted was governed by findings that were expressed in *Bloomberg v. The New York City Department of Education*, No. 17 Civ. 3136 (PGG) (S.D.N.Y. Sept. 24, 2019) that I discussed in my proposed third amended complaint that strictly concerns my 4/27/17 claims.

68. According to *Bloomberg v. The New York City Department of Education*, No. 17 Civ. 3136 (PGG) (S.D.N.Y. Sept. 24, 2019), the Mayor, members of the New York City Council, and other government officials were explicitly prohibited by from conducting town hall meetings and other similar meetings inside of schools controlled by the New York City Department of Education after school use, unless the following prerequisites were satisfied:

   a. "Candidate forums are permitted provided all candidates are invited to participate."

   b. "Permit applications for candidate forums must include a written representation that all candidates have been invited to participate."

69. The preceding prerequisites clearly confirm that they were designed to foster discussion and debate by political rivals in government elections in accordance with the intent of New York State's Open Meetings Law. As a result, such perquisites directly rebut Judge Schofield's contention in her 9/30/19 order that the Mayor's 4/27/17 town hall was a limited public

forum. This point is reinforced by the fact that the preceding excerpts apply to the additional

excerpt from *Bloomberg v. The New York City Department of Education* that confirms it:

> "No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official,
> candidate, candidates, slate of candidates or political organization/committee may be held
> in a school building after school/business hours, except as indicated in paragraphs II.C
> and II.D below."

70. The prohibition that I just discussed is discussed in greater detail in a memorandum that was

issued by the New York City Department of Education on 6/22/09 and is shown in a PDF file

that is available on the Internet at the following address:

> https://cdn-blob-prd.azureedge.net/prd-pws/docs/default-source/default-document-
> library/d-130-6-22-2009-final-remediated-wcag2-0.pdf

71. That PDF file corresponds to regulation number D-130 by the New York City Department of

Education's Chancellor and the prohibition that I discussed above appears on page 6 within

it. Information on that page indicates that prohibition stems from New York State Education

Law section 414 and policies by the New York City Department of Education.

72. Concerning what I just discussed, ample reason exists to believe that the Mayor's 7/12/17

town hall was one of many town hall and resource fair meetings that Defendant City illegally

conducted for the benefit of the Mayor, members of the City Council, and other government

officials partly by having not invited all candidates to participate in them. For example, there

is no reason to believe that Defendant City's personnel invited the following people to attend

the Mayor's 7/12/17 town hall nor any other town hall or public resource fair meeting that he

conducted:

> Bo Dietl, Sal Albanese, Mike Tolkin, Aaron Foldenauer, and Nicole Malliotakis

73. The preceding group of people were among those who ran against the Mayor in the 2017

New York City government elections. Concerning what I just discussed, Mr. Albanese

previously told me that he was prevented from attending a public town hall meeting that the Mayor conducted with a member of the City Council and other government officials in a school in Brooklyn on 8/30/17 that I was also illegally prevented from attending.

74. It is absolutely necessary to diligently do the following to reach an informed decision about whether the Mayor's 7/12/17 town hall was conducted in an illegal manner with respect to what I just discussed:

    a. Determine whether and when people who were running for election against the Mayor and all other government officials who attended the Mayor's 7/12/17 town hall from within the room in which it was conducted while they were running for re-election were invited by the Mayor's office, Fernando Cabrera's office, and other government officials to attend the Mayor's 7/12/17 town hall from within the room in which it was conducted instead of brazenly violating the federal Hatch Act (see 5 U.S.C. §1502(a)) by using the Mayor's 7/12/17 in any way as a campaign event that would benefit the re-election interests of the Mayor, Mr. Cabrera, and government personnel who supported them partly by attracting publicity and perhaps goodwill toward them.

75. It is absolutely necessary to diligently do the following to reach an informed decision about whether the Mayor's 7/12/17 town hall was subject to New York State's Open Meetings Law:

    a. Pay very close attention to the following while watching the entire video recording that the Mayor's office arranged to be recorded of the Mayor's 7/12/17 town hall:

        i. The sum and substance of all that was discussed between members of the public and **a)** other members of the public, **b)** the Mayor, **c)** Mr. Banks, and **d)**

other government officials who attended that public forum.

b. Identify all of the government officials who attended that public forum from within the room in which it was conducted and the specific government agencies that they represented while doing so.

c. Identify how senior of a position within such government agencies that the government officials who attended the Mayor's 7/12/17 town hall held as they attended that public forum and interacted with members of the public within the room in which that public forum was conducted on 7/12/17 as it was conducted, shortly before it began, and after it concluded.

d. Learn what may be reported by the members of the public who attended the Mayor's 7/12/17 town hall from within the room it which it was conducted shortly before it began, as it was conducted, and shortly after it ended about **a)** precisely how it was conducted, **b)** precisely how access by members of the public to that room was granted and denied by government personnel, **c)** the sum and substance of conversations that members of the public had among themselves and with government officials while they were in that room on that date, and **d)** the identities of the government officials who attended that town hall from within that room and the extent to which they interacted with members of the public while doing so.

e. Learn about precisely what was written by members of the public on comment cards that they were issued in the building that hosted the Mayor's 7/12/17 town hall while they were in it that they then submitted to government personnel while they were in it.

f. Learn about the precise nature of all of the responses that were received by members

of the public who attended the Mayor's 7/12/17 town hall from either the room in which it was conducted or its overflow room in response to the comment cards that they filled out while they were in the building that hosted that event and submitted to government personnel.

g. Pay very close attention to what was reported by the following sources of information about how the Mayor's 7/12/17 town hall was conducted within the room in which it was conducted and the extent to which government officials granted and denied members of the public access to the room in which it was conducted as it was conducted room was granted and denied:

    i. Video recordings that were recorded on 7/12/17 by video security cameras that may have existed on 7/12/17 in the room in which the Mayor's 7/12/17 town hall was conducted.

    ii. Video recordings that were recorded on 7/12/17 by video security cameras that existed on 7/12/17 in a hallway located directly outside of the room in which the Mayor's 7/12/17 town hall was conducted. The City of New York has been legally required to have preserved those video recordings.

    iii. Video recordings that were recorded on 7/12/17 by video security cameras that may have existed on 7/12/17 in the overflow room that was used for the Mayor's 7/12/17 town hall was conducted. The City of New York has been legally required to have preserved those video recordings.

    iv. Twitter, Facebook, and other Internet social media postings that were posted on the Internet and may have included photographs and video recordings as and after the Mayor's 7/12/17 town hall was conducted by people who

attended it from within the room in which it was conducted shortly before it
began, as it was conducted, and shortly after it ended that describe how that
public town hall meeting was conducted and identified government officials
who attended it.

   v. News reports that discussed how the Mayor's 7/12/17 town hall was
conducted and identified government officials who attended it.

  vi. Other photographs and video recordings that were taken and otherwise
recorded on 7/12/17 in the room in which the Mayor's 7/12/17 town hall was
conducted shortly before it began, as it was being conducted, and shortly after
it ended.

  vii. Audio recordings that were recorded on 7/12/17 in the room in which the
Mayor's 7/12/17 town hall was conducted shortly before it began, as it was
being conducted, and shortly after it ended.

 viii. Other electronic communications (such as e-mail and text messaging) that
people engaged in on 7/12/17 within the room in which the Mayor's 7/12/17
town hall was conducted as well as within the overflow room that was used
for that town hall shortly before that town hall began, as it was being
conducted, and shortly after it ended that may have discussed how that town
hall was being conducted within the room in which it was conducted.

  ix. Electronic communications that members of the NYPD and other government
personnel may have engaged in on 7/12/17 within the building that hosted the
Mayor's 7/12/17 town hall shortly before that town hall began, as it was being
conducted, and shortly after it ended that may have discussed how that town

hall was being conducted within the room in which it was conducted and
access by members of the public to that room was being granted and denied
by government personnel shortly before that town hall began, as it was being
conducted, and shortly after it ended.

    x.  Electronic communications that members of the NYPD and other government
personnel may have engaged in on and prior to 7/12/17 that may have
contained information about the following:

        1)  People who were to not be permitted to attend the Mayor's 7/12/17
town hall shortly before that town hall began, as it was being
conducted, and shortly after it ended from within the room in which it
was conducted.

        2)  Work assignments that may have been issued by Defendant Stribula
and others to government personnel who were involved in **a)** granting
and denying members of the public access to the room in which the
Mayor's 7/12/17 town hall was conducted shortly before that town hall
began, as it was being conducted, and shortly after it ended, **b)**
performing security functions for that town hall, and **c)** engaging in
other work that was related to how that town hall was conducted.

76. The following court decisions apply to what I just discussed and collectively confirm that the
Mayor's 7/12/17 town hall was a public forum that was subject to New York State's Open
Meetings Law:

    a.  *In Holden v. Cornell Univ.,* 80 A.D.2d 378, 440 N.Y.S.2d 58 (App. Div. 1981), the
court stated the following about New York State's Open Meetings Law:

> "The Open Meetings Law is to be given a broad and liberal construction so as to achieve the purposes for which it was enacted as evidenced by the legislative declaration contained in section 95 of the law"

b. In *Orange Pub. v. Newburgh,* 60 A.D.2d 409, 401 N.Y.S.2d 84, 45 N.Y.2d 9 (App. Div. 1978), the Court similarly stated the following about New York State's Open Meetings law:

> "Absent from the Florida statute, but included in our own, is the declaration of legislative intent enabling an interpretation and application most favorable for its intended beneficiary — the public."

c. In *News 12 v. Hempstead Schs. Bd.,* 52 Misc. 3d 479, 31 N.Y.S.3d 788 (Sup. Ct. 2016), the court stated that "The court can equate the performance of a public duty with the conducting of public business."

77. New York State's Open Meetings law is partly comprised of New York State Public Officer Law §100, §102, §103, §104, and §107. The following is a pertinent excerpt from New York State Public Officer Law §102:

> "As used in this article: 1. "Meeting" means the official convening of a public body for the purpose of conducting public business, including the use of videoconferencing for attendance and participation by the members of the public body.
>
> 2. "Public body" means any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law, or committee or subcommittee or other similar body of such public body."

78. The following are pertinent excerpts from New York State Public Officer Law §103:

> "(a) Every meeting of a public body shall be open to the general public, except that an executive session of such body may be called and business transacted thereat in accordance with section ninety-five of this article."
>
> "(d) Public bodies shall make or cause to be made all reasonable efforts to ensure that meetings are held in an appropriate facility which can adequately accommodate members of the public who wish to attend such meetings."

79. What follows are pertinent excerpts from *Best v. New York City Dept. of Correction*, 14 F. Supp. 3d 341 (S.D.N.Y. 2014). That court decision is relevant in this complaint because I am pursuing selective-enforcement claims that correspond to the class-of-one legal theory that is based upon an illegitimate animus. *Best v. New York City Dept. of Correction*, 14 F. Supp. 3d 341 (S.D.N.Y. 2014) presents the legal standard for such claims.

    a. ""Plaintiff also purports to assert a Fourteenth Amendment equal-protection claim. (*See generally* Pl.'s Opp'n 10-19.) "Where... [a] [p]laintiff does not claim to be a member of a protected class, he may bring an equal protection claim under one of two theories: selective enforcement or `class of one.'" *Rankel v. Town of Somers,* 999 F.Supp.2d 527, 544, 2014 WL 715702, at *11 (S.D.N.Y. Feb. 25, 2014). Plaintiff does not claim to be a member of a protected class in his Amended Complaint, and the only two equal-protection theories that he discusses in his Opposition are selective enforcement and class of one. (*See* Pl.'s Opp'n 14-19 (discussing Plaintiff's selective-enforcement claim); *id.* at 10-14 (discussing Plaintiff's class-of-one claim).)

    "To state a selective-enforcement claim, a plaintiff must plead: (1) he was `treated differently from other similarly situated' individuals and (2) `that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Rankel,* 999 F.Supp.2d at 544, 2014 WL 715702, at *11 (quoting *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir.2007)); *see also Martine's Serv. Ctr., Inc. v. Town of Wallkill,* 554 Fed.Appx. 32, 35, 2014 WL 321943, at *2 (2d Cir. Jan. 30, 2014) ("An equal protection claim premised on selective enforcement requires a showing that (1) compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitution rights, or by a malicious or bad faith intent to injure [the plaintiff].""

    b. ""Under a class-of-one theory, a plaintiff must allege that he has been `intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Rankel,* 999 F.Supp.2d at 544, 2014 WL 715702, at *11 (quoting *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir.2010))"

## STATEMENT OF FACTS

1. On both 6/26/17 and 2/23/18, I talked with Defendant O'Neill face-to-face about illegal acts that had been committed against me by members of the Mayor's NYPD security detail at

public forums that were conducted partly by the Mayor. My conversations with Mr. O'Neill on those dates occurred during public meetings that were conducted at the New York City Bar Association on 6/26/17 and at the New York Law School on 2/23/18 while the first meeting was recorded on audio and the second meeting was recorded on video. The following is a link to a report on the Internet that the New York City Bar Association issued and describes the meeting it conducted on 6/26/17 during which I talked with Mr. O'Neill:

> https://www.nycbar.org/media-listing/media/detail/a-conversation-with-new-york-city-police-commissioner-james-p-oneill

2. The following is a link to a report on the Internet that the New York Law School issued and describes the meeting it conducted on 2/23/18 during which I talked with Mr. O'Neill:

> https://www.citylandnyc.org/watch-live-stream-149th-cityland-breakfast-with-nypd-commissioner-james-oneill/

3. The following is a link to the audio recording on the Internet that the New York City Bar Association arranged to be recorded on 6/26/17 of the meeting during which I talked with Defendant O'Neill:

> http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3

4. The next screenshot is from a video recording that I recorded on 6/26/17 at 8:35 am at the New York City Bar Association that shows Defendant O'Neill in it as he stood at a podium with microphones that had the names of various New York City news outlets on them.



5.  The fact that no one reported anything in the news about what I discussed with Mr. O'Neill on 6/26/17 at that meeting is related to my claims in this action that pertain to 5/23/17. That also confirms that the following news outlets whose personnel attended that 6/26/17 meeting are really whistleblower news censorship outlets that should burn their journalism façade that masks egregious censorship they commit to allow New Yorkers who value transparency, accountability, and a free instead of a complicit and subservient press to realize that they should boycott them indefinitely because their censorship enable the NYPD's mob to keep flagrantly violating civil rights of mine and many others in New York City:

    PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, ABC News

6.  The video recording that I recorded of Mr. O'Neill during that meeting that I just discussed is available on the Internet at the following address:

    https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sharing

7.  During that meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill. My first conversation with him during that meeting stretches from the elapsed time of **a)** 32

minutes and 38 seconds from the beginning of that audio recording to **b)** 33 minutes and 36 seconds. My second conversation with him during that meeting stretches from the elapsed time of **a)** 47 minutes and 4 seconds from the beginning of that audio recording to **b)** 49 minutes and 14 seconds. The following is entirely true and accurate about what Mr. O'Neill and I discussed during that meeting:

a. I told him that I was a military veteran and reminded him that he used the comment of "a free and open society" in a speech that he gave during that meeting. I then pointedly asked him why members of the NYPD who were inside of the Bronx Supreme Court on 5/23/17 illegally directed court officers assigned to that courthouse to prevent me from attending the public resource fair meeting that the Mayor conducted in that courthouse on that date inside of the Veteran's Memorial Hall chamber within it and while members of the NYPD have no jurisdiction in courthouses because jurisdiction for law-enforcement in New York State courthouses belongs to New York State court officers instead of the NYPD. When he responded to that by claiming that he wasn't aware of that situation, I told him that I had a video recording that confirmed what I had just apprised him about had occurred and that I was willing to share that video recording with him if he so desired. My conversation with him then about that matter certainly relates back to my 5/23/17 claims in this action.

b. I asked him when members of the NYPD would stop violating civil rights by shoving military veterans standing legally on empty public sidewalks while Mr. Redmond illegally discriminated against them by preventing them from attending public town hall meetings that the Mayor holds. While asking him that question, I specifically

referred to the public town hall meeting that the Mayor held on 4/27/17 in Long

Island City in Queens that Mr. Redmond illegally prevented me from attending. In

response, Mr. O'Neill was blatantly evasive and deceitful by claiming that different

issues applied to that question. When he asked what I was talking about in particular

with regards to my question, I told him that I was talking about public meetings, New

York State's Open Meetings Law, the U.S. Supreme Court decision that was issued in

*Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that concerns

viewpoint discrimination, Mr. Redmond's status as a defendant at that time in

*Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) about

which I later discovered from a transcript and video that Mr. Redmond committed

perjury on 5/19/17 during a sworn deposition he gave concerning a critically

significant fact, and why Mr. Redmond was still being allowed to be a member of the

NYPD since he was violating my civil rights after he had violated Mr. Sherrard's

civil rights. When Mr. O'Neill told me during that meeting that he would need t o talk

with Mr. Redmond and that he wasn't aware of *Sherrard v. City of New York*, I

offered at the end of that meeting to give him a printout that I had with me of

information shown on its docket sheet that listed that case's case number.

8.  A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I

clearly put him on notice then that members of the Mayor's NYPD security detail were

violating my civil rights at public forums that the Mayor had been conducting and that Mr.

O'Neill told me in response that he would need to talk with Mr. Redmond about what I then

discussed with him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the

authority to issue a standing order to Mr. Redmond to make certain that he and the rest of the

Mayor's NYPD security detail immediately stop violating the civil rights of New Yorkers at public forums. Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion is sufficient to establish that this Court's determinations about claims that I am asserting against Mr. O'Neill in this pleading for supervisory liability must be in my favor because additional illegal acts and omissions were committed against me in violation of my civil rights by Mr. Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

9.  The following is a link to the audio recording that the New York Law School arranged to be recorded on 2/23/18 of the meeting during which I talked with Defendant O'Neill as he stood in front of a whistleblower news censor in journalism named Madina Toure who works for an organization named Politico New York:

    https://www.youtube.com/watch?v=fUrg_x7NFJ4

10. My conversation with Mr. O'Neill on 2/23/18 at the New York Law School begins at the elapsed time of 54 minutes and 20 seconds in that video and lasted for roughly one minute. In short, that video confirms all of the following:

    a.  I reminded Mr. O'Neill then about the conversation that he and I had on 6/26/17 at the New York City Bar Association.

    b.  I reminded him that he previously told me that he would need to follow-up with Mr. Redmond about what I discussed with him on 6/26/17.

   c.  I told him that following my conversation with him on 6/26/17, I was illegally prevented from attending public hearings in which I sought to testify on 9/8/17 and 11/27/17. Defendant Cruz is among those liable for the illegal acts that were committed against me on 9/8/17 in that regard with respect to a public hearing that the Mayor conducted then in City Hall about reforming the NYPD. Defendants Cruz, Nieves, and Redmond are among those liable for the illegal acts that were committed against me on 11/27/17 in that regard with respect to a public hearing that the Mayor conducted then in City Hall about privacy matters.

   d.  Mr. O'Neill mainly chose to behave like a coward by being evasive and engaging in stonewalling and grandstanding in response to my remarks to him then instead of properly addressing them.

   e.  I pointed out to him that I had given a sworn deposition that I gave as I implied that it had been for claims against the City of New York that were in response to illegal acts that were committed against me by members of the NYPD.

11. Following that 2/23/18 conversation, members of the Mayor's NYPD security detail continued to commit illegal acts and omissions against me at public forums that the Mayor conducted while Mr. O'Neill continued to be the NYPD's Commissioner. Such criminal acts were committed against me on 3/18/19 during a public hearing that the Mayor conducted in the Blue Room inside of City Hall.

12. The following is a link to a web page that from the New York City Department of Education's web site that confirms that the Mayor's 7/12/17 town hall was conducted inside of a school that is operated by the New York City Department of Education and subject to its rules and regulations:

https://www.schools.nyc.gov/schools/X447

13. The following screenshot from that web page underscores this fact:



14. The following is a link to the video recording on the Internet that the Mayor's office arranged

    to be recorded of the Mayor's 7/12/17 town hall:

    https://www.youtube.com/watch?v=ioqvVEqen8M

15. The next screenshot is from that video recording and reflects what is shown in it at the

    elapsed time of 11 minutes, and 41 seconds. What is significant about that point in that video

    is that the Mayor (shown on the far-left) was beginning to tell a lie by claiming the following

    that proved to have been totally false in regards to my efforts to have lawfully attended that

    town hall meeting in the room in which it was conducted and to do so at other town hall

    meetings that he conducted on 4/27/17, 6/8/17, and additional dates thereafter that I was

illegally prevented from doing by Defendant Redmond and other members of the Mayor's

NYPD security detail as well as others that include, but aren't limited to Harold Miller, Pinny

Ringel, Jessica Ramos, Shauna Stribula, and Rachel Atcheson that Judge Schofield

materially lied about in her 9/30/19 decision in this case by refusing to acknowledge the

indisputable fact that Mr. Miller and Mr. Ringel were personally involved in violating my

First Amendment right to attend the Mayor's 4/27/17 town hall:

> "When you come to a town hall meeting, it gives you faith in democracy again because
> everyone is here equally, with concern, with ideas, with questions. And it's a chance for
> us to have a real conversation."



16. The preceding remarks that the Mayor stated during that town hall are sufficient to establish

that that town hall meeting was subject to New York State's Open Meetings Law.

17. The next screenshot is from that video recording and reflects what is shown in it at the

elapsed time of 17 minutes, and 29 seconds. The Mayor was then beginning to make remarks

that lasted until the elapsed time of 18 minutes and 3 seconds in that video as he explicitly

claimed that the public would be able to meet and talk with other government officials who

attended that town hall meeting in the room in which it was conducted who were senior

members of his administration about their concerns at the end of that meeting and that those

officials would stay there all night if necessary to meet with members of the public. At the

elapsed time of 17 minutes and 10 seconds in that video, the Mayor announced that the

leadership of the NYPD was in attendance at that town hall. By making those remarks about

that, the Mayor further confirmed that that town hall meeting was subject to New York

State's Open Meetings Law.



18. The next screenshot is from that video recording and reflects what is shown in it at the

elapsed time of 17 minutes, and 16 seconds. The Mayor is shown on the far-right with his

back to the camera as he stood. Someone who appears to be Defendant O'Neill is shown in

the lower-left corner as he sat. Mr. O'Neill is bald.



19. If Mr. O'Neill attended that town hall meeting and I had been permitted to attend it while it

was conducted, I would have certainly used that opportunity to talk with both him and Bronx

Borough President Ruben Diaz, Jr. in a very public way while recording those conversations

on audio or video. The public notice that was issued for that town hall meeting indicated that

Ruben Diaz, Jr. would be present at that town hall. Mr. Diaz, Jr.'s office is located inside of the Bronx Supreme Court. I certainly would have sought to talk with both him and Defendant O'Neill on 7/12/17 in the room in which that town hall was conducted while members of the public and journalists were within earshot about the fact that I was illegally prevented from attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair meeting as I would have also then followed-up with Mr. O'Neill about the conversation that I had with him on 6/26/17 at the New York City Bar Association. In fact, I would have asked them to watch video recordings then and there that I had with me that were recorded by video security cameras that were installed inside of the Bronx Supreme Court on 5/23/17 while the Mayor was conducting his public resource fair inside of the Veterans' Memorial Hall chamber within it as I was being illegally prevented from attending it by Rachel Atcheson, Defendants Gerola, Nieves, Berkowitz, and New York State court officers. As a reminder, I received those video recordings prior to 7/12/17 from the New York State Office of Court Administration in response to a Freedom of Information Law demand that I submitted to it. In short, I would have ordered both Defendant O'Neill and Mr. Diaz, Jr. there and then on 7/12/17 to provide me with a credible and valid explanation about why I was illegally prevented from attending those earlier public forums in flagrant violation of my constitutional rights as I would have also then directed them to tell me in their capacities as public servants what specific corrective action they would take in response to the information that I shared with them about that.

20. The next screenshot is from that video recording and reflects what is shown in it at the elapsed time of 2 hours, 47 minutes, and 23 seconds as there were then plenty of empty seats in that room while I was being illegally prevented by members of the NYPD and members of

the Mayor's staff from lawfully exercising my legal rights to attend that town hall public

forum from within that room.



21. The next screenshot from that video reflects what is shown in it at the elapsed time of 1

hours, 2 minutes, and 48 seconds and shows **a)** a New York City government official named

Gregg Bishop as he stood and wore an orange tie and **b)** Mr. Banks in the lower-left corner.



22. Based upon the fact that town hall meeting was scheduled to begin at 7 pm, what is shown in the preceding screenshot corresponds to a time that was after 8 pm on 7/12/17. Also, as I pointed out in my proposed third amended complaint that is strictly for my 4/27/17 claims, I engaged in protected whistleblowing as I talked with Mr. Bishop on 4/27/17 as he left the school that hosted the Mayor's 4/27/17 town hall by informing him that I had been illegally prevented from attending that town hall while I then had active litigation against the City of New York. I was then referring to my HRA lawsuit by that remark. I also then asked him about how it could be arranged to have the City of New York to cancel its government contracts with a company that was committing wage-theft. I was then referring to NTT and wage-theft that it was committing against me largely due to fraud and negligence by Judge Schofield. My conversation with Mr. Bishop on 4/27/17 was recorded on video. If I had been permitted to attend the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted, he, Mr. Banks, and Darcel Clark were among government officials that I would have sought to talk with for a variety of reasons that include trying to determine whether Mr. Bishop would acknowledge the conversation that I had with him on 4/27/17 and asking Ms. Clark to prosecute Urban and HRA as well as their personnel for fraud and negligence that they committed against me that **a)** enabled me to be viciously assaulted on 7/2/16 where I reside, **b)** subjected to an illegal bait-and-switch fraud and forgery concerning the apartment lease agreement that I signed on 2/16/16 in HRA's offices for apartment 4C that is located in the building in which I reside, and **c)** caused me to have been illegally deprived of government benefits to which I was legally entitled to receive from HRA that concerned the payment of storage expenses on my behalf while I resided where I reside. I would have also then asked Ms. Clark why her team egregiously engaged in

prosecutorial misconduct to my detriment and that of the general public in the criminal

prosecution that the Bronx District Attorney's office commenced against Ronald Sullivan for

having assaulted me on 7/2/16 where I reside. In that case, her team inexcusably didn't use

any witness other than me in spite of my having provided her team with the names of

witnesses in November of 2016 via e-mail that included the name of someone to whom Mr.

Sullivan made incriminating remarks to on 7/2/16 about having just assaulted me as Mr.

Sullivan fled from the building in which he had just assaulted me. Ms. Clark's team also

inexcusably didn't formally appeal decisions to the greatest extent that they could have to

appellate forums that were made by Bronx Criminal Court Judge Cori Weston in that

criminal case against Mr. Sullivan that ended in February of 2017. In that case, Ms. Weston

wrongfully ordered for relevant and admissible security logs to be suppressed that contained

information about the fact that Mr. Sullivan was observed to be angry by one of Urban's

personnel shortly after he assaulted me on 7/2/16 and running out of the building in which he

had just assaulted me. Scott McDonald, Jr. was the main prosecutor in that criminal case

about whom I would have sought to legally grill Ms. Clark on 7/12/17 while talking with her

during that town hall within the room in which it was conducted while I would have been

legally recording that conversation on audio or video. I would have also then sought to grill

Ms. Clark to find out why her team didn't immediately arrange for Mr. Sullivan to be kept in

jail or otherwise have an order of protection issued against him on my behalf after he

assaulted me on 7/2/16. The NYPD unconscionably released him from its custody on the

same date it arrested him on 7/11/17 for having assaulted me on 7/2/16 in spite of the fact

that a member of the NYPD told me on 7/2/16 in front of the building where I reside that she

observed redness on my head in the area where Mr. Sullivan punched me more than 15 times.

That assault caused me to be diagnosed on 7/2/16 with a head injury and abrasions to my arms. It also caused me to be diagnosed with a concussion on 7/30/16 that was from that assault. I discussed that assault and the criminal prosecution against Mr. Sullivan for having committed it with Karl Pfeffer of the Mayor's NYPD security detail on 4/27/17 at the site of the Mayor's 4/27/17 town hall as I was being illegally prevented from attending that town hall. Also, the Mayor appointed Judge Weston. For that reason, I continue to hold him partly liable for Mr. Sullivan having not been found guilty in the criminal prosecution that was commenced against him for having assaulted me and I have sought to lawfully reciprocate against him and his administration at public forums that the Mayor has conducted by engaging in whistleblowing that would partly be about the fact that the Mayor is partly responsible for Mr. Sullivan being able to be free to suddenly and viciously assault others instead of being in jail where he belongs to befit the interests of public safety.

23. Furthermore, in the event that I would have been permitted to attend the Mayor's 7/12/17 town hall from within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended, I would certainly have used that opportunity to engage in whistleblowing about all of the matters that I intended to engage in whistleblowing about during the town hall and resource fair meetings that the Mayor conducted with Mr. Banks and other government officials on 4/27/17, 5/23/17, and 6/8/17 that I was illegally prevented from attending within the rooms in which they were conduced while they were conducted. I also would have certainly engaged in whistleblowing in that room in that circumstance against everyone who had been involved in illegally preventing me from entering that room while that town hall was being conducted.

24. Moreover, in the event that I would have been permitted to attend the Mayor's 7/12/17 town

hall from within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended, I would certainly have used that opportunity to request assislftance from the government officials with being provided the same benefits and services that I sought to be able to request from them directly and indirectly during the town hall and resource fair meetings that the Mayor conducted with Mr. Banks and other government officials on 4/27/17, 5/23/17, and 6/8/17 that I was illegally prevented from attending within the rooms in which they were conduced while they were conducted.

25. As I stated earlier in this pleading, the City of New York is a corporation. I'm among its stakeholders. Due to the wrongful acts and omissions by its personnel against me that caused me substantial and irreparable harm, it was my objective to do whatever necessary within the bounds of all applicable law while attending the Mayor's 7/12/17 town hall to try to arrange for the Mayor's administration to be treated like trash and thrown away by voters, prospective voters, political rivals, and journalists by trying to use that public forum to engage in major whistleblowing that would function as a spark to set off the equivalent of a raging wildfire to lawfully incinerate the Mayor's re-election prospects in the hope that the Mayor's replacement would vastly outperform him and his administration for my benefit and that of countless others in a wide variety of meaningful ways. One of the ways by which I sought to accomplish that was through widespread word-of-mouth advertising that I hoped would take hold as a result of my whistleblowing.

26. The following is a link to a Twitter posting on the Internet that was posted on the Internet on 7/7/17 at 3:21 pm by a Twitter account that is registered to New York City Councilman Fernando Cabrera and has the username of "@FCabreraNY":

   https://twitter.com/FCabreraNY/status/883405533981667329

27. That Twitter posting included a notice about the Mayor's 7/12/17 town hall that reported

   when and where it would be conducted and how members of the public could register in

   advance to attend it.

28. The next 3 screenshots are from that notice that appeared in that Twitter posting and contain

   relevant information:



29. Those screenshots confirm that town hall was co-sponsored by 4 New York City community

   boards, a community center, a merchants association, and an Owners Corporation. The

   members of those groups along with other members of the public had a First Amendment

   right to be able to receive information from me on 7/12/17 inside of the room in which the

   Mayor's 7/12/17 town hall was conducted shortly before it began, as it was conducted, and

   shortly after it ended in a way that wouldn't disrupt how that public forum was conducted.

Along with taxpayers, the groups that co-sponsored the Mayor's 7/12/17 town hall likely shared in the costs and efforts that were paid and otherwise taken to have the Mayor's 7/12/17 town hall conducted. It is patently indisputable that my rights pursuant to the First Amendment, Fifth Amendment, Fourteenth Amendment, and New York State's Open Meetings Law confirm that I had all of the following legal rights that apply to the Mayor's 7/12/17 town hall:

    a.  The right to access and lawfully assemble within the room in which the Mayor's 7/12/17 town hall was conducted while seating was available in it shortly before it began, as it was conducted, and shortly after it ended.

    b.  The right to talk with and receive information from members of the public, journalists, and government officials that included Mr. Banks, Bronx District Attorney Darcel Clark, and members of the NYPD face-to-face while they were in the room in which that town hall was conducted shortly before it began, as it was conducted, and shortly after it ended. Ms. Clark attended that public forum.

    c.  The right to obtain public records such as comment cards, brochures, flyers, etc. that government personnel made available in the room in which that town hall was conducted shortly before it began, as it was conducted, and shortly after it ended.

    d.  The right to take photographs, record video recordings, and record audio recordings in the room in which that town hall was conducted shortly before it began, as it was conducted, and shortly after it ended.

    e.  The right to lawfully distribute printed material as a whistleblower and critic that I prepared and brought with me that was critical of the Mayor's administration and its business partners to members of the public, journalists, and government personnel in

the room in which that town hall was conducted shortly before it began, as it was conducted, and shortly after it ended.

    f.   The right to petition government personnel that included the Mayor, Mr. Banks, Darcel Clark, and members of the NYPD for redress of grievances while I would have otherwise been in the room in which that town hall was conducted shortly before it began, as it was conducted, and shortly after it ended.

    g.   The right to otherwise engage in expressive association and protected whistleblowing while talking with people as I would have otherwise been inside of the room in which that town hall was conducted shortly before it began, as it was conducted, and shortly after it ended.

30. What follows shows the e-mail message that I sent on 7/5/17 at 11:04:24 pm to the e-mail address of "townhallrsvp@cityhall.nyc.gov" that the Mayor's office used to process registrations that members of the public submitted to attend the Mayor's 7/12/17 town hall. Some of the subject matter for the whistleblowing about which I intended to lawfully do at that town hall within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended is also shown in that e-mail. Other matters that I intended to engage in whistleblowing about during that town hall within the room in which it was conducted while it was conducted also included, but weren't limited to those that pertained to the payment of storage expenses on my behalf while I resided where I reside, HRA's legal duty to reimburse me for storage expenses that I paid, and its legal duty to reimburse me for an iPhone of mine and costs and higher cell phone costs that arose from an iPhone of mine having been stolen between 2/21/16 and 2/22/16 from within a facility that HRA operated.

**From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
**Subject:** RSVP for 7/12/17 public Town Hall meeting with New York City's Mayor
**Date:** July 5, 2017 at 11:04:24 PM EDT
**To:** townhallrsvp@cityhall.nyc.gov

My name is Towaki Komatsu

This e-mail serves as my RSVP for the 7/12/17 public Town Hall meeting New York City's Mayor will hold in the Bronx.

A copy of this e-mail will be provided tomorrow to the U.S. Attorney's office for the Southern District of New York in relation to valid complaints that I filed with it concerning flagrant and repeated acts of viewpoint discrimination I was illegally subjected to on 4/27, 5/23, and 6/8 by members of the Mayor's security team, his staff, and court officers assigned to the Bronx Supreme Court.

The following are two of the valid reasons why I wish to attend that public meeting I have a legal right to attend pursuant to New York State's Open Meetings Law:

a) To calmly and lawfully order the Mayor to immediately fire Steven Banks because of negligence by him and the New York City Human Resources Administration that enabled me to be assaulted on 7/2/16 that caused me to sustain a concussion and go without access to legal assistance and/or representation that HRA's Office of Civil Justice is required by law to ensure I have access to and can help me resolve wage-theft litigation by one of HRA's business partners named NTT Data, Inc.

b) To calmly and lawfully order the Mayor to end New York City's business with Urban Pathways, Inc. that is a partner of HRA and claims to be a non-profit provider of housing. The basis for my request is because Urban Pathways, Inc. committed a bait-and-switch fraud against me that caused me to have to share an apartment with the person who assaulted me in it on 7/2/16 and tried doing so in it on 5/12/16 before a security officer assigned to Urban Pathways, Inc. stopped that attempt and reported the incident to his manager that was required by law to report that incident to HRA. In response to that incident on 5/12/16 and the separate reports I made to HRA on 3/16/16 and 4/1/16 about Urban Pathways, Inc.'s fraud, HRA was obligated to take appropriate corrective action to ensure that my safety was not at risk. Instead, HRA ignored my valid complaints and I periodically continue to experience post-concussive problems.

I will ask lawyers, military veterans, and news reporters to be at the 7/12/17 public meeting with me to witness any members of the NYPD, Mayor's staff, and others that interfere with my legal rights there in order to ensure that the full weight of justice is brought to bear upon them pursuant to all applicable law and without mercy.

31. The fact that I followed the instructions that were listed in the public notice that was issued for the Mayor's 7/12/17 town hall to register in advance to attend it further confirms that I had a procedural due process right as it pertains to the Fourteenth Amendments' equal protection provisions and its prohibitions against selective-enforcement and discrimination to attend the Mayor's 7/12/17 town hall from within the room in which it was conducted while seating was available in it and other members of the public were being permitted to enter that room while that town hall was being conducted after they had been waiting in the overflow room that was setup for that town hall.

32. The next screenshot shows a pertinent excerpt from an e-mail message that I sent on 7/5/17 at 5:37:56 pm to the civil rights division of the U.S. Attorney's office for the Eastern District of New York to report a valid complaint to it against Defendant Gerola in response to illegal acts that he committed against me on 6/8/17 at the site of the Mayor's 6/8/17 town hall meeting in Rego Park in Queens as he illegally prevented me from being able to attend that town hall from within the room in which it was conducted as it was conducted while seating was available within it.



33. What follows shows text that appeared in the PDF file shown in that e-mail message to

convey my complaint against Mr. Gerola. Text that is shown in that excerpt that appears as

"XXX" refers to redactions that I added to protect the privacy of a witness of mine whose

identity I previously agreed to keep private:

> "NYPD Officer Gerola (badge #: 6577) illegally subjected me to viewpoint
> discrimination by refusing a request I made to him on 6/8/17 to enter the main room of a
> public Town Hall meeting that the New York City Mayor held in Rego Park in Queens
> on 6/8/17 as people left the room in which that meeting was being held and as it
> continued. Instead, I was kept in an "overflow" room located in the basement of the
> building where that meeting was held as the meeting was held upstairs and I watched that
> meeting unfold on TV screens that were setup in the basement and confirmed people
> were leaving that meeting after they asked questions in it. By not letting me enter that
> main room Mr. Gerola engaged in activities with others at that meeting that violated my
> rights pursuant to New York State's Open Meetings Law; 42 U.S.C. 241, 245, 246; 42
> U.S.C. 1985 because his actions materially prevented me from asking the Mayor and the
> commissioners of New York City government agencies that were present to help me to
> get job interviews with their agencies, make the Mayor aware of the fact that I had been
> subject to illegal viewpoint discrimination and battery by his security team and a NYPD
> Officer at a public town hall meeting that was held on 4/27/17 in Long Island City,

follow-up with him about a commitment he expressed to me at a public town hall on 3/15/17 in Manhattan about getting legal assistance that is among the videos on YouTube, and ask the Mayor to order the commissioner of the New York City Human Resources Administration to provide me with public assistance benefits I'm entitled to under New York State law that it has failed to do and forced me to commence litigation against it at the New York Supreme Court. XXX is XXX who was also illegally denied entry into the main room at that 6/8/17 meeting and is a witness. XXX e-mail address is: XXX. I had not met XXX prior to that meeting."

34. What follows shows text and screenshots that appear in the Word file that was attached to the e-mail message that I sent on 7/5/17 to the U.S. Attorney's office for the Eastern District of New York to report a valid complaint to it against Defendant Gerola. It includes information about the illegal acts that he and others committed against me on 4/27/17, 5/23/17 and 6/8/17 at the sites of the town hall meetings and resource fair meetings that the Mayor conducted on those dates.

    1.  Photo I took in the basement of the Rego Park public town hall meeting at 8:16 pm on 6/8/17 of one of the TV screens that were setup in that overflow room that confirmed seating was available in the main room upstairs where the meeting was being held:



    2.  NYPD Officer Gerola (badge #: 6577) is shown on the right side of this photo that I took from outside of the building where the 6/8/17 Rego Park public town hall

meeting was held, after he made it clear that he would not let me into the main room that is behind the clock in the photo where the meeting was held with the Mayor and other politicians. This photo was taken at 9:29 pm on 6/8/17 and the meeting was still taking place in that main room. Mr. Gerola previously violated my civil rights on 4/27/17 at the site of a public town hall meeting in Long Island City by interfering with my right to ask the Mayor why his head of security illegally violated my civil rights by not letting me attend that meeting after I was issued an admission ticket for it. Mr. Gerola also violated my civil rights on 5/23/17 inside of the Bronx Supreme Court on 5/23/17 and where he has no jurisdiction. He did so on that date by working with others to keep me out of a public meeting inside of the Veterans Memorial Hall room located inside of that court.



35. Just 7 days after I sent that e-mail message, Mr. Gerola again illegally prevented me from attending the Mayor's 7/12/17 town hall within the room in which it was conducted as it was conducted in much the same way that he did so on 6/8/17 with respect to the town hall that the Mayor then held.

36. The next screenshot is from a video that I recorded on 7/12/17 at 7:50 pm inside of the school that hosted the Mayor's 7/12/17 town hall as I stood in a hallway that led to the entrance to the room in which the Mayor was then conducting that town hall. That video recording is available on the Internet at the following address:

https://drive.google.com/file/d/1VmkjfVgtbzzSEI2bRK54QwxxWSySP1vx/view?usp=sharing



37. Defendants Gerola, Jane Doe 7/12/17, Shauna Stribula (wearing an off-white colored jacket

   with her back facing my cell phone's camera), and part of NYPD John Doe 7/12/17 are

   shown in the screenshot above as they stood in that hallway while I was being illegally

   prevented the room in which the Mayor was conducting that town hall. Mr. Gerola is clearly

   shown standing in the doorway of the room in which the Mayor was then conducting that that

   town hall without any valid legal justification instead of standing away from it or standing to

   the side of that doorway to not obstruct people who sought to enter and leave that room. The

   unspoken body language that Mr. Gerola clearly exhibited to me largely by choosing to use

   his body to be a physical obstruction in that doorway to block me from being able to lawfully

   exercise my constitutional rights to walk past him and into that room to attend that public

forum without according me any due process whatsoever in that regard is sufficient to enable me to prevail with my claims against him in this pleading that concern the Mayor's 7/12/17 town hall largely because that behavior by him was part of a larger pattern of illegal and similar behavior against me at  public forums that the Mayor conducted.

38. The next screenshot is from the same video that I just discussed and shows what is shown in it at the very start of that video. It shows Jane Doe 7/12/17 as she stood in front of the entrance to the room in which the Mayor was conducting that town hall. It also shows members of the public walking behind her as they exited the room in which that town hall was being conducted. Jane Doe 7/12/17 lied to me on 7/12/17 in the hallway in which I recorded that video by claiming that I could not enter the room in which the Mayor was conducting that town hall as he did so because that room had reached its capacity and that it would be a fire hazard if I attended it in that room. I immediately knew that she was lying and made a remark to her that was similar to "nice try" as I believe that I also then pointed out to her that people were leaving that room and that fact clearly confirmed that that room was not at its capacity.



39. The next screenshot is from the same video that I just discussed and shows more of what is

shown in it at the very start of that video.



40.  The preceding screenshot shows all of the following in it:

    a.  Jane Doe 7/12/17 as she stood in front of the entrance to the room in which the Mayor

        was conducting that town hall.

    b.  Defendant Lance wearing a white shirt as he talked with someone while he was aware

        that I was not being allowed to enter the room in which the Mayor was conducting

        that town hall. He illegally made no effort to intervene on my behalf to uphold my

        constitutional right to attend that town hall and he thereafter continued to not try to

        intervene for that purpose at additional town hall meeting that the Mayor conducted

        that I was illegally barred from while he was present where I was at the sites of those

        town hall meetings and on-duty as a member of the NYPD. He previously illegally

        didn't intervene on my behalf to try to enable me to attend the Mayor's 4/27/17 town

        hall while I was being prevented from attending it as he and I stood near the entrance

        to the school that hosted that town hall.

    c.  NYPD John Doe 7/12/17 as he met with 2 other members of the NYPD who were

        assigned to its Community Affairs unit. NYPD John Doe 7/12/17 told me inside of

        that building on 7/12/17 that there was nothing that he could do to enable me to attend

        the Mayor's 7/12/17 town hall meeting in the room in which it was being conducted

        as I talked with him in a hallway in that building that was near where I stood as I

        recorded that video.

41. The next screenshot is from the same video that I just discussed at the elapsed time of 5

    seconds. NYPD John Doe 7/12/17 is shown in it as he stood on the left in that screenshot as

    he met with 2 other members of the NYPD who were assigned to its Community Affairs unit.

    A video security camera is also clearly shown in that screenshot in the top-right corner. The

City of New York has been legally required to preserve all of the video recordings that were recorded by that security camera on 7/12/17 while I was inside of the building that hosted that town hall meeting.



42. The next screenshot is from that same video and from the elapsed time of 10 seconds in it. It shows Defendant Baez in it as he talked with another member of the NYPD near the entrance of the room in which the Mayor was conducting that town hall. He then knew that I was being prevented from entering that room and had a Fourteenth Amendment affirmative legal duty to have intervened on my behalf to uphold my constitutional right to have attended that town hall in that room as it was being conducted. He illegally didn't try to intervene on my behalf and instead illegally directed me to stand away from the entrance to that room.



43. The next screenshot is from a video that I recorded on 7/12/17 at 8:24 pm while I was inside of the overflow room that was setup for the Mayor's 7/12/17 town hall. That video recording is available on the Internet at the following address:

https://drive.google.com/file/d/1zxtgP2Pq8GF9Tuw4ufRr0cCHR9SBkQuZ/view?usp=sharing



44. I recall that the Black male who's head is shown in the lower-right corner of the preceding

     screenshot was allowed to enter the room in which the Mayor conducted that town hall

     meeting as it was being conducted in stark contrast to me. I had been sitting directly behind

     him in that overflow room. The fact that he was able to attend it in contrast to me was a clear

     violation of my Fourteenth Amendment due process and equal protection rights as well as my

     rights pursuant to the First Amendment, Fifth Amendment, and New York State's Open

     Meetings Law. I recall that another man named Cesar Boc who had also waited in that

     overflow room while I was in it was also permitted to thereafter attend that town hall within

     the room in which the Mayor conducted it. He thereafter gave me his business card that

     shows that he is a community organizer and works for an organization named the Urban

     Justice Center.

45. While I was inside of that overflow room, I worked to try to offset the fact that I was being

     illegally discriminated against yet again by members of the NYPD and Mayor's staff by

     distributing printed material to members of the public who were in it with me that I prepared

     and contained whistleblower information about a wide range of subjects and was critical of

     the Mayor's administration, NYPD, HRA, HRA's business partners (including NTT and

     Urban), judges, and others. Some of such printed material that I then distributed to people

     were things that I prepared earlier that day while the rest was material that I prepared prior to

     that date. The following is a link to a report that I prepared at 8:34 am on 7/12/17 and printed

     numerous copies of on that date before I distributed them to people in that overflow room

     who overwhelmingly welcomed receiving it from me:

     https://drive.google.com/file/d/1cKtEX4EV5ASHN8FuvNGdJFNLLPjEcg3L/vie
     w?usp=sharing

46. The next screenshot is from a video that I recorded on 7/12/17 at 8:56 pm while I stood near
    the entrance to the room in which the Mayor was conducting that town hall on that date while
    I was being illegally denied my right to enter that room while seating was available in it.
    Roughly 3 empty seats are shown in that screenshot. That video recording is available on the
    Internet at the following address:

    https://drive.google.com/file/d/1zxtgP2Pq8GF9Tuw4ufRr0cCHR9SBkQuZ/view?usp=sh
    aring



47. The following screenshot from that same video shows Defendant Cruz on the left and
    Defendant Baez on the right as they stood directly outside of the entrance to the room in
    which the Mayor was then still conducting that town hall while Mr. Cruz and Mr. Baez were
    aware that I was being prevented from entering it:



48. Mr. Cruz and Mr. Baez illegally made no effort to try to intervene on my behalf to enable me to attend that public forum in that room. In fact, I recall that Mr. Baez illegally directed me to stand further away from the entrance to that room as people exited it. Also, Mr. Cruz was recorded on video on 4/27/17 while he was present near me by the entrance to the school that hosted the Mayor's 4/27/17 town hall as I was being illegally prevented from entering that school to attend that earlier town hall. He illegally didn't try to intervene on my behalf then either to enable me to attend that earlier public forum.

49. The next screenshot is from the same video that I have just been discussing and shows Defendant NYPD John Doe2 7/12/17 on the right as he stood behind Jane Meyer of the Mayor's staff (shown holding bottles of water).



50.  The area behind them led to the overflow room for that town hall. Defendant NYPD John

Doe2 7/12/17 told me on that date in that hallway that there was nothing that he could do to

enable me to attend the Mayor's 7/12/17 public town hall meeting as I talked with him about

the fact that I was being prevented from attending it in the room in which the Mayor was

conducting it.  Defendant NYPD John Doe2 7/12/17 instead told me then that I needed to

talk with someone else about that. I talked earlier that night with Defendant Berkowitz in the

immediate vicinity of the area where NYPD John Doe2 7/12/17 is shown in the preceding

screenshot. During my conversation with Mr. Berkowitz then, I pointed out to him that I was

being prevented from attending the Mayor's 7/12/17 town hall from within the room in

which it was being conducted to have him perform his legal duty to intervene on my behalf

to enable me to attend that town hall from within that room as it was being conducted.

However, he illegally refused to intervene.

51. As people left the room in which the Mayor's 7/12/17 town hall was being conducted to

leave that building, I continued to distributed the remainder of the printed material that I

discussed earlier that I brought with me there to engage in whistleblowing and expressive

association against the Mayor's administration, its business partners, and more. Such

handouts continued to be accepted without hesitation by those who left that room and

building to review.

52. The next screenshot is from a video that I recorded on 7/12/17 at 9:20 pm while I stood near

the entrance to the room in which the Mayor was conducting that town hall on that date while

I was still being illegally denied my right to enter that room while seating was available in it.

That video recording is available on the Internet at the following address:

   https://drive.google.com/file/d/1Cepd-LxdCb8Ee7-
   _B0ZjdaghIUzcNhCt/view?usp=sharing



53. Defendant Redmond and Defendant Baez are the 2 people shown on the right in that

screenshot and Defendant Redmond was aware that I was being prevented from entering that

room to attend that town hall after he had just walked past me to enter it.

54. The next screenshot is from that same video and confirms that as Mr. Redmond moved from

where he had just been standing, he gave me a line of sight to where tables in that room were

on which public records existed that I had a legal right to obtain and otherwise then view.



55. The next screenshot shows a draft e-mail message that I created and saved on 7/12/17 at 9:34

pm while I was still in that school. It shows that I used that e-mail message to record

information that I had just received from someone in that building who worked for Spectrum

News (also known as NY1) to use to pitch whistleblower news to it to report.

| | | |
|---|---|---|
| Towaki Komatsu <towaki_komatsu@yahoo.com> | 🗀 Drafts – Yahoo! | July 12, 2017 at 9:34 PM |
| (No Subject) | | |
| Desk@ny1.com | | |

56. What follows is a long e-mail message that I sent to NY1 on 7/13/17 at 5:06 pm to follow-up

with it to try to have it report about the illegal acts and omissions that were being committed

against me at public forums that the Mayor was conducting in the wake of my having talked

with one of NY1's staff members on 7/12/17 inside of the building that hosted the Mayor's

7/12/17 town hall. Earlier e-mail messages that I sent to and received from a whistleblower

news censor in journalism named Graham Rayman about that same subject are shown in that

e-mail thread as well. Mr. Rayman works for the New York Daily News. After I sent that e-

mail message to NY1, it proved to be just like Mr.Rayman and the New York Daily News by

wrongfully censoring the whistleblowing information that I shared with it.

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: Following-up about discrimination by Mayor's NYPD security detail at Bronx town hall last night
> **Date:** July 13, 2017 at 5:06:15 PM EDT
> **To:** desk@ny1.com
>
> Hi,
>
> Good afternoon.
>
> We met last night in the hallway outside of the main room at the Bronx Town Hall meeting that the Mayor held.
>
> I'm sending you this message to try to see if your news organization would be interested investigating and reporting about flagrant viewpoint discrimination by the Mayor's NYPD security detail and office staff.
>
> Last night was the fourth time I was subjected to viewpoint discrimination by the Mayor's security detail at public meetings since 4/27/17.
>
> Prior to reaching out to you, though I received a commitment on 6/30/17 shown below from Graham Rayman of the New York Daily News to have an article appear in it that would be based upon detailed and corroborated information I and others independently gave him about this subject, he reneged on that agreement.
>
> Instead, Jillian Jorgensen from the Daily News wrote the following superficial piece about that issue that failed to mention information that I and others shared with Graham:
>
> http://www.nydailynews.com/new-york/manhattan/nyc-pol-chin-blasted-cops-seizing-leaflets-town-hall-article-1.3309608
>
> Regards,

Towaki Komatsu

Begin forwarded message:

**From:** "Rayman, Graham" <grayman@nydailynews.com>
**Subject:** RE: My RSVP for 5/23 Bronx Resource Fair!
**Date:** June 30, 2017 at 11:50:13 AM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>

We need to photograph you. what's your cell number again?
Thanks
Graham
212 210 2234

**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Friday, June 30, 2017 11:31 AM
**To:** Rayman, Graham
**Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!

It's up to O.C.A. They have 20 business days to fulfill my request. The NY Times
recently filed a lawsuit about a request made to someone else for information that wasn't
fulfilled within the 20 day deadline.

On Jun 30, 2017, at 11:21 AM, Rayman, Graham <grayman@nydailynews.com> wrote:
Yes. How soon can you do it?

**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Friday, June 30, 2017 11:21 AM
**To:** Rayman, Graham
**Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!

Can I drop the stuff off today? I put the stuff on a USB stick and named the files pretty
descriptively for you. The Mayor's staff member didn't give me her name. I'm still
waiting to get the video footage for a 3rd security camera from inside the Bronx Supreme
Court that was located right above her at the entrance to the room I wasn't let inside. I'll
likely be given that by the middle of next week from the New York State Office of Court
Administration located at 25 Beaver Street that is handling my FOIL request.

On Jun 30, 2017, at 11:08 AM, Rayman, Graham <grayman@nydailynews.com> wrote:
Thanks. I'm writing this today for Sunday. Did you send me the Gerola video? Who was
the member of the mayor's staff?

**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Friday, June 30, 2017 11:07 AM
**To:** Rayman, Graham

**Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!

I forgot to tell you that right after the NYPD, court officers, and a member of the Mayor's staff illegally kept me out of the 5/23 public meeting in the Bronx Supreme Court, I immediately told Councilmen Brad Lander and Jumaane Williams in-person around 1 pm on that date at a meeting by Goldman Sachs' office in lower Manhattan that it had just happened to me.

On Jun 28, 2017, at 6:16 PM, Rayman, Graham <grayman@nydailynews.com> wrote: Ok thanks. Will continue working on it tomorrow.

Sent from my iPhone

On Jun 28, 2017, at 6:09 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote: By the way, I've got a video of NYPD Officer Gerola telling me on 4/27 after 10 pm that it was the Mayor's staff that was responsible for having kept me out of that event. Unfortunately, my phone was pointed at the ground as I accidentally recorded that video. Also, I then talked with both Nic Gulotta and Harold Miller of his staff to try to get an explanation about why I had been discriminated against by Redmond on 4/27. I met Harold Miller on 4/11 in Staten Island's Borough Hall after Mr. Banks lied to me outside that building.

On Jun 28, 2017, at 5:41 PM, Rayman, Graham <grayman@nydailynews.com> wrote:

Was it the resource fair you were barred from, or the mayor's Bronx town hall? Those were two separate events.

On Wed, Jun 28, 2017 at 5:37 PM, Rayman, Graham <grayman@nydailynews.com> wrote:


**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Wednesday, June 28, 2017 5:35 PM
**To:** Rayman, Graham
**Subject:** My RSVP for 5/23 Bronx Resource Fair!



Begin forwarded message:
**From:** CommunityAffairs <communityaffairs@cityhall.nyc.gov>
**Date:** May 22, 2017 at 2:09:43 PM EDT
**Subject:** Reminder: Tomorrow is the Bronx Resource Fair!
A reminder that you are on the RSVP list for tomorrow's Bronx Resource Fair!
Top city commissioners and senior staff will be at The Bronx County Building Veteran's Memorial Hall at 851 Grand Concourse tomorrow from 9 AM to 1 PM.

We look forward to seeing you there!

¡Le recordamos que usted está en la lista de reservaciones para la Feria de Recursos de la Ciudad que La Alcaldía en Su Condado presenta mañana, martes 23 de mayo! Comisionados y funcionarios destacados de la Administración estarán en el Salón conmemorativo de los Veteranos en el Edificio del Condado de El Bronx, 851 de Grand Concourse, de 9 AM a 1 PM.
¡Lo esperamos!

57. The next screenshot is from the elapsed time of 11 seconds in a video that I recorded on 7/12/17 at 10:01 pm while I stood near the entrance to the room in which the Mayor had been conducting that town hall on that date while I was still being illegally denied my right to enter that room while seating was available in it. That video recording is available on the Internet at the following address:

https://drive.google.com/file/d/1dvCsFU1PxdUAeEQWmnirqTmwrBwcxksE/view?usp=sharing



58. In the preceding screenshot, a Black male is shown as he just exited the room in which the Mayor conducted that town hall. That Black male is shown walking past Defendant Nieves, who is shown looking into that room while standing directly next to one of the doors to it.

The Black male to whom I just referred was the very same person who had been sitting directly in front of me earlier that night in the overflow room that was setup for that town hall. Mr. Nieves had been aware that night that I was being prevented from entering that room while the Mayor was conducting his town hall meeting in it and while I would have otherwise been able to enter that room to talk with him and other government officials inside of it shortly after that town hall meeting ended. Mr. Nieves illegally didn't try to intervene on my behalf to enable me to lawfully exercise my constitutional right to enter that room.

59. The next screenshot is from the elapsed time of 31 seconds in that same video and shows another man who was wearing a red tie and had just exited the room in which the Mayor conducted that town hall as he walked past Mr. Nieves. That man had also previously waited inside of the overflow room while I was in it and had been sitting on the left side of that room then. He is shown in that screenshot with very short hair, a thin beard, and holding something in his hands that seems to have been a cell phone.



60. The next screenshot is from the elapsed time of 39 seconds in that same video and clearly shows Jane Doe 7/12/17 in the lower-left corner as people continued to exit the room in which the Mayor conducted that town hall and walk past Mr. Nieves while doing so. Jane Doe 7/12/17 appeared to then be collecting comment cards from members of the public as they left that room. I had an equal right with respect to the members of the public who had been in that room while that town hall was being conducted to have been in there with them, received a comment card from the Mayor's staff during that time, recorded questions and criticisms on it while I would have otherwise been in that room as that town hall was conducted, and then handed it to Jane Doe 7/12/17 as I exited that room. Jane Doe 7/12/17 was among others who illegally deprived me of my ability to exercise that Fourteenth Amendment, First Amendment, and Fifth Amendment right that I had to do have done precisely that at that town hall by having been among those who illegally denied me access to that room.



61. The next screenshot shows a relevant excerpt from an e-mail message that Defendant Ramos sent to a whistleblower news censor named Erin Durkin and the Mayor's old mouthpiece

Eric Phillips on 6/28/17 at 3:27 pm while Ms. Durkin worked for the New York Daily News and Mr. Phillips was the Mayor's press secretary. I previously shared that e-mail message with this Court and the opposing counsel in this case. The e-mail message that screenshot is from appears on page 373 within the 374-page PDF file. Ms. Ramos lied in in that e-mail message by claiming that I had never RSVP'd to a town hall. She then stated that I was allowed to be present in overflow rooms. She was then referring to overflow rooms for town hall meetings that the Mayor conducted and was implicitly acknowledging that I was barred from attending town hall meetings that the Mayor conducted from within the room in which he conducted them as they were being conducted.

---

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

---

62. When Ms. Ramos sent that e-mail message to Ms. Durkin about me, she was responding to the e-mail message shown next that Ms. Durkin sent to Mr. Phillips about me on 6/28/17 at 1:53 pm as she sought a valid explanation for why I had been illegally been prevented from attending the Mayor's 4/27/17 town hall, the Mayor's 5/23/17 resource fair, and the Mayor's 6/8/17 town hall entirely and otherwise within the rooms in which they were conducted as they were conducted. I have reason to believe that the reference to "Shack" that is used in that e-mail message refers to a whistleblower news censor in journalism who works for the New York Daily News named Graham Rayman. He is a basketball fan and that reference may refer to former NBA player Shaquille O'Neal whose well-known nickname was "Shaq".

That e-mail message appears on the last page within the 374-page PDF file.

---

**From:** Erin Durkin <██████████████> on behalf of Erin Durkin <<u>edurkin@nydailynews.com</u>>
**Date:** Wednesday, June 28, 2017 at 1:53 PM
**To:** Eric Phillips <<u>efphillips@cityhall.nyc.gov</u>>
**Subject:** town halls

Hi Eric,
We're writing about a man named Towaki Komatsu who says he has been barred repeatedly from the mayor's town halls. He is filing a CCRB complaint, though I don't believe it's been filed yet. Shack is taking the lead on the story but asked us to reach out. He says he was barred from the town halls on 4/27 in Long Island City, May 23 at the Bronx Supreme Court, and June 8 in Rego Park, each time by members of the mayor's security detail. The first two he was barred from entering, the third he was sent to an overflow room with a video feed and not allowed into the main event after other people had left. Wondering if this is accurate, and if so why he's been barred?

Thanks,
Erin

---

63. The next screenshot is from a Twitter posting that was posted on the Internet on 7/12/17 at 7:41 pm by a Twitter account that is registered to Defendant Ramos that has the username of "jessicaramos". That Twitter posting is available on the Internet at <u>https://twitter.com/jessicaramos/status/885283071246913538</u>. The sum and substance of the statement shown in that Twitter posting indicates that Ms. Ramos was present at the Mayor's 7/12/17 town hall as it was being conducted in flagrant violation of my rights pursuant to the First Amendment, Fifth Amendment, Fourteenth Amendment, and New York State's Open Meetings Law to have also attended the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted.

---

 **Jessica Ramos**
@jessicaramos

At town hall with Council Member Cabrera in #TheBronx, @NYCMayor announces added lighting and new gates for DeVoe Park.

7:41 PM · Jul 12, 2017 from Bronx, NY · Twitter for iPhone

---

64. The table shown next lists relevant information about e-mail messages that hindsight

confirms I sent between 7/9/17 and 7/11/17 to whistleblower news censors in journalism to

try to have their organizations report news about the illegal acts and omissions that were

committed against me on 4/27/17, 5/23/17, 6/8/17 by members of the Mayor's NYPD

security detail, New York State court officers, and members of the Mayor's staff in regards

to the public town hall and public resource fair meetings that the Mayor conducted on those

dates. I mistakenly referred to "4 dates" in the subject line of the e-mail message that I sent to

Carl Campanile of the New York Post on 7/10/17 at 12:28:15 pm that corresponds to the

information that appears in the third row within that table. After I sent those e-mail messages,

nothing was reported by the news organizations to which I sent them about what I discussed

in them.

| # | To | News Organization | Sent | Subject |
|---|-----|------------------|------|---------|
| 1 | ddowty@syracuse.com<br><br>jobrien@syracuse.com | Syracuse | 7/11/17 at 5:27:52 PM | Re: Reporting about discrimination by court officers, members of the New York City Mayor's NYPD security detail and a member of his staff in the Bronx Supreme Court on 5/23/17 |
| 2 | ccampanile@nypost.com | New York Post | 7/10/17 at 12:28:15 PM | Re: NYPD discrimination & excessive force at public meetings on 4 dates |
| 3 | jim.p.hoffer@abc.com | ABC | 7/9/17 at 9:25:10 PM | Reporting viewpoint discrimination & excessive force news by NYPD on 3 dates that the New York Daily News buried |
| 4 | PIX11Investigates@PIX11.com<br><br>helpme@pix11.com | PIX11News | 7/9/17 at 9:24:44 PM | Reporting viewpoint discrimination & excessive force news by NYPD on 3 dates that the New York Daily News buried |
| 5 | 7OnYourSideNina@abc.com | ABC | 7/9/17 at 9:23:57 PM | Reporting viewpoint discrimination & excessive force news by NYPD on 3 dates that the New York Daily News buried |

| 6 | tips@nytimes.com | New York Times | 7/9/17 at 9:23:21 PM | Reporting viewpoint discrimination & excessive force news by NYPD on 3 dates that the New York Daily News buried |
| 7 | ny1foryou@ny1.com | Spectrum News (also known as NY1) | 7/9/17 at 9:23:04 PM EDT | Reporting viewpoint discrimination & excessive force news by NYPD on 3 dates that the New York Daily News buried |
| 8 | benjamin.mueller@nytimes.com | New York Times | 7/9/17 at 9:21:58 PM | Re: Reporting viewpoint discrimination & excessive force news by NYPD on 3 dates that the New York Daily News buried |

65. I suspect that one or more of those news organizations contacted the Mayor's office between

7/9/17 and 7/12/17 prior to the Mayor's 7/12/17 town hall in response to the e-mail messages

that I sent to the staff of those news organizations to do preliminary investigative work as

journalists to determine whether there it was true that illegal acts and omissions were

committed against me on 4/27/17, 5/23/17, 6/8/17 by members of the Mayor's NYPD

security detail, New York State court officers, and members of the Mayor's staff in regards

to the public town hall and public resource fair meetings that the Mayor conducted on those

dates. I equally suspect that Defendant Ramos and/or other members of the Mayor's staff and

NYPD security detail responded to those inquiries by **a)** committing defamation against me

by claiming that I was too blame for what had occurred at those earlier public forums or **b)**

otherwise lied by claiming that such civil rights crimes had not occurred at those public

forums. I further believe that one of the reasons why I was illegally prevented from attending

the Mayor's 7/12/17 town hall within the room in which it was conducted as it was

conducted and shortly after it ended was in retaliation for my having contacted members of

the press less than one week before that 7/12/17 town hall to try to get press coverage about

the earlier illegal acts and omissions that were committed against me on 4/27/17, 5/23/17,

6/8/17 by members of the Mayor's NYPD security detail, New York State court officers, and

members of the Mayor's staff in regards to the public town hall and public resource fair

meetings that the Mayor conducted on those dates. I believe that such retaliation was

designed to illegally prevent me from being able to talk about those earlier civil rights crimes

against me with others while I would have otherwise attended the Mayor's 7/12/17 town hall

from within the room in which it was conducted and shortly after it ended. I further believe

that such retaliation was based upon the desire to protect the Mayor's re-election by

minimizing valid criticism against him, members of his NYPD security detail, and members

of his staff for illegal acts and omissions that constituted violations of the federal Hatch Act,

voter suppression, voter fraud, and whistleblower retaliation at public forums that the Mayor

conducted and used as campaign events to boost his chances of being re-elected.

66. Roughly 3 weeks before the Mayor's 7/12/17 town hall was conducted Defendant Nieves

was recorded on video as he illegally interfered with the rights of members of the public to

attend the public town hall meeting that the Mayor conducted in Chinatown in Manhattan.

The discussion that follows and concerns that is relevant to my claims in this pleading

because it pertains to a pattern of illegal behavior by him and other members of the NYPD at

a public town hall meeting that the Mayor conducted that was in close proximity with respect

to time insofar as the date when the Mayor's 7/12/17 town hall was conducted. Such civil

rights abuse by Defendant Nieves and other members of the NYPD at that earlier town hall

meeting foreshadowed similar civil rights crimes that were committed against me at the

Mayor's 7/12/17 town hall.

67. The following is a link to a video recording on the Internet that shows Defendant Nieves as

he illegally interfered with the First Amendment right that a woman had to bring literature

into the town hall meeting that she attended and was conducted in Chinatown in Manhattan

on 6/21/17:

https://www.youtube.com/watch?v=KRur-_QvbC0

68. The following description of that incident was provided by Aaron Foldenauer on the web

page on which that video recording is shown while he was then a candidate to become a

member of the City Council as he ran against New York City Councilwoman Margaret Chin:

"At a June 21, 2017 Town Hall meeting paid for by public funds hosted by Mayor de
Blasio and Lower Manhattan City Council Member Margaret Chin, de Blasio's security
detail searched attendees' bags to confiscate opposing political literature possessed by
members of the public.

In this video, confiscated political literature can be seen sitting by the metal detector.
Furthermore, at 0:59-1:14, a security officer in a blue tie confiscates almost all political
literature held by an Asian female citizen.

Aaron Foldenauer, an attorney and challenger for Chin's City Council seat in Lower
Manhattan, witnessed the NYPD's seizure of political literature first-hand."

69. On 6/23/17, a news organization named DNAInfo published a news article on the Internet at

https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-hall-

margaret-chin-aaron-foldenauer that is entitled "Security Swiped Political Pamphlets at

Mayor's Town Hall, Attendees Say" and was written by a journalist named Allegra Hobbs.

The next screenshot is very relevant and is from a video recording that was included in that

report. Defendant Nieves is shown illegally confiscating literature from a woman as she

sought to enter the building that hosted the public town hall meeting that the Mayor

conducted in it on that date to attend that public forum. Mr. Nieves is shown standing next to

Jane Meyer of the Mayor's staff in that screenshot.



70. The following is a relevant excerpt from that news article:

> ""At the security checkpoint, the security detail confiscated several individual flyers that my campaign staffer had received from other organizations in advance of the event," he continued. "My staffer and I were also forced to relinquish the flyers we had in our bags about my campaign. Furthermore, I saw many other members of the public being forced to relinquish individual political flyers in their possession."
>
> Foldenauer's communications director Jiexi Tian said she had an anti-Chin flier in her hand as she went through security, and was forced to relinquish it before entering the venue.
>
> Video footage shared by Foldenauer shows members of the public halted by security officers — one appearing to be an NYPD officer — who dig through their papers to determine whether they may be admitted or not. In one video, a security officer wearing a suit and a blue tie is seen taking several green papers from a woman entering the event."

71. On 7/20/17, a news organization named NY Press published a news article on the Internet at

http://www.nypress.com/local-news/20170720/nypd-lawyer-quells-free-speech-dispute

entitled "NYPD Lawyer Quells Free Speech Dispute" that was written by a journalist named

Richard Khavkine about how members of the NYPD illegally seized literature that belonged

to people who sought to attend the Mayor's 6/21/17 town hall meeting in Chinatown in

Manhattan as they attempted to lawfully enter the building that hosted that town hall meeting

on the date it was held. The following is a relevant excerpt from that article that reports part

of the sum and substance of a conversation that a civil rights attorney named Norman Siegel

had with an attorney for the NYPD about that matter:

> According to several people who attended the June 21 event, in Chin's district, uniformed and plainclothes NYPD personnel at a security tent riffled through would-be attendees' belongings and seized political flyers, banners and signs critical of either Chin or de Blasio or that supported opposition candidates before they allowed people into the YMCA on Bowery.
>
> **Siegel said police officials knew who within the department had given the directive for the searches and confiscations. Siegel was given that person's rank and but not his or her name.**
>
> **Siegel said the department lawyer was cautious during the pair's phone conversation, likely because of possible litigation against the city.**
>
> In letters sent to de Blasio and police Commissioner James O'Neill earlier this month, Siegel said "Such actions by state actors raise serious constitutional concerns under the First and Fourth Amendments to the United States Constitution."
>
> In the July 8 letters, Siegel said the confiscations raised several questions, including whether officials were aware of the confiscations; what the rationale might have been; whether an investigation was underway; and which steps would be taken "to ensure that the First and Fourth Amendment rights of the public are respected."

(boldface formatting added for emphasis)

72. On 7/7/17, the New York Daily News also published a news article that was about the fact

that members of the NYPD illegally seized literature that belonged to people who sought to

attend the Mayor's 6/21/17 town hall meeting in Chinatown in Manhattan as they attempted

to lawfully enter the building that hosted that town hall meeting on the date it was held. That

news article is entitled "Councilwoman Margaret Chin blasted over Cops Seizing Leaflets

from Attendees at Town Hall in Chinatown", was written by Jillian Jorgensen, and is

available on the Internet at https://www.nydailynews.com/new-york/manhattan/nyc-pol-chin-

blasted-cops-seizing-leaflets-town-hall-article-1.3309608. The following is a relevant excerpt

from that news article:

> "And she said the NYPD took away 8.5-by-11-inch paper fliers that were not signs. One
> officer even tried to confiscate ballot petitions she had been storing in her backpack, she
> said.
>
> "They were actually looking for any leaflets and taking them any of the leaflets, they
> were taking all of them out of people's knapsacks, pocketbooks," Wilcke said. "Even one
> person had one in his back pocket as he walked in and they told him to come back and
> said you can't bring that in."
>
> She wanted to know who order the materials to be taken away.
>
> "It was very much set up that you almost started thinking that **this was like a campaign
> event rather than a true town hall**," she said. "And that's' where the ethics line really
> blurs.""

> (boldface formatting added for emphasis)

## CAUSES OF ACTION

**CLAIM #1:** **Violations of the First Amendment right of access to a public forum, to
protest in a public forum, to record audio and video recordings in a public
forum, to take photographs in a public forum, to receive information in a
public forum, to have the opportunity to talk with journalists in a public
forum, to distribute whistleblowing literature in a public forum, to engage in
lawful assembly in a public forum, to engage in freedom of expression in a
public forum, to otherwise engage in whistleblowing and criticism of
government officials in a public forum, to engage in expressive association,
and to petition government officials in a public forum for redress of
grievances**

### (Against All Defendants)

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

   forth herein.

2. I also incorporate by reference as though fully set forth herein the decision that was issued on

5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to

relevant findings it contains about First Amendment rights in public forums, supervisory

liability, and other pertinent things.

3.  My right to lawfully protest in a public forum in a manner that doesn't disrupt how that

    public forum is conducted while valid time, place, and manner restrictions do not exist to

    prohibit such protest in a public forum was acknowledged the following remark that Judge

    Schofield expressed in the decision that she issued in *Gonzalez v. City of New York*, No. 14

    Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016):

    > "Two branches of First Amendment claims are relevant to the present case: (a)
    > interference with the right to protest in a public forum and (b) retaliation for exercising
    > First Amendment rights."

4.  More importantly, my right to lawfully protest in a public forum in a manner that doesn't

    disrupt how that public forum is conducted while valid time, place, and manner restrictions

    do not exist to prohibit such protest in a public forum was confirmed by the following

    excerpt from *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

    > "a state may not restrict First Amendment rights, absent valid time, place, or manner
    > restriction. *See Dean*, 354 F.3d at 551; *Galvin v. Hay,* 374 F.3d 739, 751 (9th
    > Cir.2004) (**"As speakers may generally control the presentation of their message by
    > choosing a location for its importance to the meaning of their speech, speakers may
    > ordinarily— absent a valid time, place and manner restriction—do so in a public
    > forum."); *Childs v. Dekalb Cnty., Ga.,* 286 Fed.Appx. 687, 693-94 (11th
    > Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court
    > precedent, "police officers have known for decades that protestors present on public
    > property have a First Amendment right to peacefully express their view, in the absence of
    > narrowly tailored ordinances restricting the time, place, or manner of the speech")."

    > (boldface formatting added for emphasis)

5.  Due to the facts and circumstances that I have discussed at length and with sufficient

    specificity in this pleading, I have decisively established that the Defendants identified above

    were personally involved in having willfully, callously, and wantonly illegally violated my

First Amendment rights and otherwise illegally condoned that in relation to my efforts to have attended the Mayor's 7/12/17 town hall from within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended. Those abuses occurred as a direct result of the following:

    a.  The arbitrary, capricious, and standardless discretion that the Defendants maintained against me as they illegally refused to allow me to enter the room in which the Mayor's 7/12/17 town hall was conducted as it was conducted and shortly after it ended.

    b.  The Defendants having ignored the significance of the information shown in the e-mail message that I sent to "townhallrsvp@cityhall.nyc.gov" on 7/5/17 at 11:04 pm to register in advance to attend the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted and shortly after it ended as I warned those who read that e-mail message as a result of it having been transmitted to that e-mail address that I would pursue litigation against all who violated my rights to attend that public forum.

    c.  Defendant O'Neill having inexcusably failed to take immediate and decisive corrective action that hindsight confirms was necessary in response to my conversation with him on 6/26/17 to make certain that no member of the NYPD would interfere with my ability to lawfully attend public forums that the Mayor conducted within the rooms in which they were conducted as they were conducted.

6. Due to the violations of my First Amendment rights on 7/12/17 that occurred inside of the building that hosted the Mayor's 7/12/17 town hall, the Defendants' illegal acts and omissions against me that caused those violations to occur and maintained those acts and

omissions against me caused me irreparable harm, chilled my speech, and imposed illegal prior restraints on the entirety of what my First Amendment rights were while I was in the building in which that town hall was conducted on 7/12/17.

7.   The illegal acts and omissions that prevented me from being able to attend the Mayor's 7/12/17 town hall were driven by a desire to subject me to illegal viewpoint discrimination based upon an invidious discriminatory animus for the reasons that I have discussed in this pleading and in the pleadings of which my proposed third amended complaint is comprised insofar as they are strictly for my 4/27/17, 5/23/17, and 6/8/17 claims.

8.   Ms. Ramos is also liable for this cause of action due to her role as a co-conspirator in **a)** that conspiracy as she illegally deceived Ms. Durkin on 6/28/17 and 6/29/17 in e-mail messages that she sent to Ms. Durkin about me and **b)** the illegal acts that were committed against me on 7/12/17 in relation to the Mayor's 7/12/17 town hall in furtherance of a fraudulent scheme to try to illegally cover-up those illegal acts and omissions. Relevant findings that support this assertion about Ms. Ramos' liability exist in the decisions that were issued in _US v. Blackmon_, 839 F.2d 900 (2d Cir. 1988), _Escalera v. Samaritan Village Men's Shelter_, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), _US v. Basey_, 816 F.2d 980 (5th Cir. 1987), _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995), _Pangburn v. Culbertson_, 200 F.3d 65 (2d Cir. 1999), and _Dunn v. City of Fort Valley,_ No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

**CLAIM #2:**      <u>**First Amendment Retaliation and Viewpoint Discrimination**</u>

**(Against All Defendants)**

1.  I incorporate by reference the information presented in the preceding paragraphs as though fully set forth herein.

2.  It's objectively reasonable to conclude from a diligent review of the totality of the circumstances and the information that I have presented in this pleading as well as those that comprise my proposed third amended complaint that are strictly for my 4/27/17, 5/23/17, and 6/8/17 claims that the defendants this claim concerns knew about much of the subject matter for the whistleblowing against them and others that I intended to lawfully engage in on 7/12/17 while attending the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted and shortly after it officially ended before I entered the building that hosted that public forum on 7/12/17.

3.   It's also objectively reasonable to conclude from a diligent review of the totality of the circumstances and the information that I have presented in this pleading as well as those that comprise my proposed third amended complaint that are strictly for my 4/27/17, 5/23/17, and 6/8/17 claims that the defendants this claim concerns absolutely didn't want me to be able to attend the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended to protect their job security and that of others in an illegal manner that certainly was at my expense as well as voters, prospective voters, political rivals, and those who otherwise supported their political rivals, such as by financing political campaigns.

4.  It is also objectively reasonable to infer from the totality of the circumstances that the illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall were partly motivated by attempts that I made to get news coverage of my HRA lawsuit and other litigation against HRA as well as other whistleblowing that I had been engaging in against HRA, the Mayor, the Mayor's administration, New York State Supreme Court Judge Nancy Bannon who was assigned to

my HRA lawsuit, the Bronx District Attorney's office, HRA's business partners, Bronx

Criminal Court Judge Cori Weston that the Mayor appointed, and other subjects between

3/15/17 and 7/12/17 about which I **a)** talked with Michael Gartland on 5/23/17 inside of the

BSC and **b)** otherwise sent e-mail messages to others in journalism during that period.

5.  As I stated earlier, Defendant Ramos is also liable for this cause of action due to her role as a

co-conspirator in a conspiracy as she covered-up the illegal acts and omissions that caused

me to have been illegally prevented from attending the Mayor's 7/12/17 town hall and earlier

public forums that he conducted between 4/27/17 and 6/8/17.


**CLAIM #3:**                    **Violations of the Fourth Amendment**

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

forth herein.

2.  Defendant Gerola exhibited a show of authority to me as he illegally subjected me to an

unofficial and illegal arrest of my ability to freely and lawfully walk into the room in which

the Mayor's 7/12/17 town hall was conducted as it was being conducted and shortly after it

ended in violation of my Fourth Amendment rights as an arrest is discussed in _Dotson v._

_Farrugia_, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012) and _People v. Alba_, 81 A.D.2d

345, 440 N.Y.S.2d 230 (App. Div. 1981):

3.  The other defendants that this cause of action concerns are also liable for it due to their roles

as co-conspirators in a conspiracy that caused me to have been prevented from attending the

Mayor's 7/12/17 town hall from within the room in which it was conducted as it was

conducted and shortly after it ended as a result of their illegal acts and omissions that **a)**

allowed that to occur and **b)** thereafter covered that up. As I stated earlier in this pleading,

this assertion is supported by relevant findings in the decisions that were issued in *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), *Escalera v. Samaritan Village Men's Shelter*, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), *US v. Basey*, 816 F.2d 980 (5th Cir. 1987), *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), and *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

**CLAIM #4:**              **Violations of the Fifth Amendment**

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  By having illegally committed acts and omissions that caused and otherwise enabled me to have been illegally prevented me from attending the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted and shortly after it ended, the Defendants violated the property interests that I had in the following without according me due process of law:

    a.  The property interests that I had with being able to attend the Mayor's 7/12/17 town hall within the room in which it was conducted while it was conducted and to be in that room after it officially ended to talk with government officials and others to express concerns to them, ask questions, express criticisms, and engage in whistleblowing. By having been illegally restricted to the overflow room for that town hall, that circumstance illegally limited the amount of information that I could receive about how that town hall was conducted to what was shown on video cameras that recorded that town hall. If I had instead been in the room in which it was

conducted as it was conducted, I wouldn't have been limited by camera angles to receive information about such things as the images of the faces of those who attended it.

    b.  The property interests that I had with all public records that were made available by government officials in the room in which the Mayor's 7/12/17 town hall was conducted.

3.  By having illegally committed acts and omissions that caused and otherwise enabled me to have been illegally prevented me from attending the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted and shortly after it ended, the Defendants violated the liberty interests that I had with being able to do so and being able to lawfully exercise the full extent of my constitutional rights and those pursuant to New York State's Open Meetings Law while doing so.

4.  As I stated earlier, Defendant Ramos is also liable for this cause of action due to her role as a co-conspirator in a conspiracy as she covered-up the illegal acts and omissions that caused me to have been illegally prevented from attending the Mayor's 7/12/17 town hall.

**CLAIM #5:**          **<u>Violations of the Fourteenth Amendment<br>Substantive Due Process Rights</u>**

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  By having illegally committed acts and omissions that caused and otherwise enabled me to have been prevented me from attending the Mayor's 7/12/17 town hall, the defendants violated my Fourteenth Amendment substantive due process rights that are discussed in

*Calicchio v. Sachem Central School District*, No. 14-cv-5958 (DRH)(SIL) (E.D.N.Y. Jan. 17, 2020).

**CLAIM #6:**                    <u>**Violations of Procedural Due Process**</u>

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The information that I have discussed in this pleading confirms that the Defendants are liable for the violations of my procedural due process rights that occurred in relation to my efforts to have attended the Mayor's 7/12/17 town hall from within the room in which it was conducted as it was conducted and to be in that room shortly after it officially ended largely because the Mayor stated during it that the public could remain in that room after that town hall ended to meet with government officials in it.

**CLAIM #7:**                    <u>**Violations of the Fourteenth Amendment**</u>
                               <u>**Equal Protection Rights**</u>

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The information that I have discussed in this pleading confirms that the defendants are liable for the violations of my Fourteenth Amendment equal protection rights that apply to similarly-circumstanced members of the general public who:

    a.  Attended the Mayor's 7/12/17 town hall.

    b.  Attended the Mayor's 2/19/20 town hall from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

c.  Criticized and otherwise booed the Mayor and Melinda Katz during the Mayor's 2/19/20 town hall from within the room in which it was conducted.

d.  Were cheered and applauded during the Mayor's 2/19/20 hall by members of the public who were in the same room as those who criticized and booed the Mayor and Ms. Katz during that 2/19/20 hall.

**CLAIM #8:**       **Violations of the Fourteenth Amendment Prohibitions Against Selective-Enforcement**

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The information that I have discussed in this pleading confirms that the defendants are liable for illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall that violated my Fourteenth Amendment right to not be subjected to selective-enforcement that corresponds to the class-of-one legal theory and is based upon an illegitimate animus.

**CLAIM #9:**       **Failure to Intervene in Violation of the Fourteenth Amendment**

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The same reasons that I just discussed about violations of my rights against selective-enforcement confirm that the defendants are liable for having failed to intervene on my behalf to try to prevent and otherwise end the illegal acts and omissions that were committed

against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall from within the room in which it was conducted and to remain in that room shortly after it ended to talk with government officials and others.

**CLAIM #10:**                    **Failure to Train and Supervise**

**(Against All Defendants except Jane Doe 7/12/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  Defendant City of New York was responsible for ensuring that the remaining defendants in this action and all other members of the NYPD who were present near me on 7/12/17 inside of the building that hosted the Mayor's 7/12/17 town hall as I sought to lawfully attend the Mayor's 7/12/17 town hall were properly trained and supervised to not commit any illegal acts and omissions against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall. However, due to Defendant City's inexcusable failure in that regard, it shares liability with the other defendants for illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall that findings in *Elrod v. Burns* confirm caused me irreparable harm.

3.  Defendant Bill de Blasio stated that he is ultimately responsible for policing with respect to how the NYPD operates. His failure to do whatever was necessary to have sufficient training and supervision in place to have the NYPD not violate my constitutional rights with respect to my efforts to have attended the Mayor's 7/12/17 town hall causes him to share liability for this cause of action. The Mayor stated that on 11/30/17 that he is ultimately responsible for policing. He made such a remark during the public town hall meeting that he conducted while it was recorded on video as a result of arrangements that the Mayor's office made. That

video recording is available on the Internet at

https://www.youtube.com/watch?v=CRV0IKbg5tQ. At the elapsed time of 1 hour, 39

minutes, and 9 seconds in that video he stated the following that confirms this point:

"If you have a problem with policing, I am ultimately responsible."

4. Section 435 of the New York City Charter states the following about some of the legal duties

that NYPD personnel have:

"a. **The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages** and assemblages **which obstruct the free passage of public** streets, sidewalks, parks and **places; protect the rights of persons and property**, guard the public health, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes to **arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**."

(boldface formatting added for emphasis)

5. Defendant O'Neill was also responsible for how the NYPD operated and its personnel were

supervised and trained while he was the NYPD's Commissioner. His failure to do whatever

was necessary to have sufficient training and supervision in place to have the NYPD **a)** not

violate my constitutional rights with respect to my efforts to have attended the Mayor's

7/12/17 town hall and **b)** prevent others from doing that causes him to share liability for this

cause of action.

6. Defendant Redmond has been partly responsible for how members of the Mayor's NYPD

security detail and other members of the NYPD operated that includes how they were trained

and supervised. His failure to do whatever was necessary to have sufficient training and supervision in place to have the NYPD **a)** not violate my constitutional rights with respect to my efforts to have attended the Mayor's 7/12/17 town hall and **b)** prevent others from doing that causes him to share liability for this cause of action.

7. As members of the NYPD, Defendants Nieves, Berkowitz, Gerola, Cruz, Baez, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, Lance have been responsible for providing proper supervision as law-enforcement personnel and public servants to detect violations of applicable laws that include constitutional rights and the following that occur in their presence and properly dealing with such violations:

    NYPL §175.25, 18 U.S.C. §245(b)(5), 18 U.S.C. §1513(e), NYPL §240.26, NYPL §240.20, NYPL §240.10, NYPL §240.65, and other applicable laws.

8. Defendants Nieves, Berkowitz, Gerola, Cruz, Baez, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, and Lance miserably failed to provide such supervision and detection on 7/12/17 and that circumstance enabled me to have been illegally prevented from attending the Mayor's 7/12/17 town hall.

9. Marco Carrion has been responsible for making certain that the members of the Mayor's CAU are properly trained and fully comply with all applicable laws as they interact with members of the public in their official capacities as members of the Mayor's CAU while acting as agents of the Mayor's office. He has also been responsible with others for making certain that all New York City government personnel who are involved in granting and denying access to the public to rooms in which the Mayor conducts town hall and resource fair meetings while the public is in them fully comply with all applicable laws and regulations while granting and denying such access to the public. Hindsight confirms that he failed to provide such training and supervision to such personnel and that was among the

factors that enabled me to have been illegally prevented from attending the Mayor's 7/12/17 town hall.

10. Shauna Stribula and Jessica Ramos have also been responsible with others for making certain that all New York City government personnel who are involved in granting and denying access to the public to rooms in which the Mayor conducts town hall and resource fair meetings while the public is in them fully comply with all applicable laws and regulations while granting and denying such access to the public. Hindsight confirms that Ms. Stribula and Ms. Ramos failed to provide such training and supervision to such personnel and that was among the factors that enabled me to have been illegally prevented from attending the Mayor's 7/12/17 town hall.

**CLAIM #11:** <u>**Violation of the New York State's Open Meetings Law**</u>

**(Against All Defendants)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have discussed in this pleading confirms that the Mayor's 7/12/17 town hall was subject to New York State's Open Meetings Law partly because a quorum that was comprised of the Mayor, commissioners of agencies that comprise the Mayor's administration, and other senior officials of the Mayor's administration attended the Mayor's 7/12/17 town hall and were there to conduct public business that involved interacting with members of the public partly to discuss how Defendant City of New York operates.

3. The information that I have discussed in this pleading confirms that all of the defendants are liable for illegal acts and omissions that were committed in relation to my efforts to have attended the Mayor's 7/12/17 town hall that violated New York State's Open Meetings Law.

**CLAIM #12:**  <u>**Abuse of Process**</u>

**(Against All Defendants)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set
    forth herein.

2.  The information that I have discussed in this pleading confirms that the defendants are liable
    for illegal acts and omissions that were committed in relation to my efforts to have attended
    the Mayor's 7/12/17 town hall that constituted an abuse of process against me that was
    designed to prevent me from engaging in whistleblowing during the Mayor's 7/12/17 town
    hall.

**CLAIM #13:**   <u>**Fraudulent Misrepresentation and Fraudulent Inducement**</u>

**(Against Defendants City of New York, Bill de Blasio, Jane Doe 7/12/17, Jessica Ramos
Andrew Berkowitz, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set
    forth herein.

2.  Through its agencies and personnel, the City of New York made fraudulent
    misrepresentations about whether the public could attend the Mayor's 7/12/17 town hall
    within the room in which it was conducted as it was conducted. By doing so through its
    agencies and personnel, the City of New York fraudulently induced me to try to attend the
    Mayor's 7/12/17 town hall. I was never notified prior to 7/12/17 that I wouldn't be permitted
    to attend the Mayor's 7/12/17 town hall.

3.  As I discussed earlier in this pleading, the Mayor made a fraudulent misrepresentation of
    material fact as he lied while he conducted his 7/12/17 town hall partly by stating that the
    public would be able to meet with the other government officials who attended his 7/12/17

town hall at the end of that meeting in that room and that they would stay there as long as the public wanted them to for that purpose. I relied on that claim to be true and accurate and that was among the reasons why I stayed in the building that hosted that town hall for its duration.

4. As I stated earlier in this pleading, Jane Doe 7/12/17 lied to my face on 7/12/17 in the building that hosted the Mayor's 7/12/17 town hall by having claimed that I couldn't enter the room in which the Mayor was conducting his town hall as it was being conducted because that room had reached its capacity limit and that it would be a fire hazard if I entered it. She therefore fraudulently induced me to not immediately exercise my legal right to walk past her, into that room, and to members of the NYPD in it to direct them to immediately arrest her for violating NYPL §240.20 and many other laws at my expense then that applied to that circumstance.

5. I previously discussed Jessica Ramos' liability for this cause of action in the pleadings that I submitted in this action that comprise my proposed third amended complaint insofar as they are strictly for my 4/27/17, 5/23/17, and 6/8/17 claims. Fraudulent misrepresentations that she made about me that caused me harm are entirely evident in her e-mail communications with Erin Durkin that I discussed in those pleadings that I have incorporated by reference as though fully set forth herein.

6. Defendants Berkowitz, NYPD John Doe1 7/12/17, and NYPD John Doe2 7/12/17 engaged in fraudulent misrepresentations toward me on 7/12/17 as they fraudulently claimed that that there was nothing that they could do to enable me to attend the Mayor's 7/12/17 town hall.


**CLAIM #14:**       **Violation of New York State General Business Law 349**

**(Against Defendants City of New York, Bill de Blasio, Berkowitz, Gerola, Nieves, Ramos, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Defendant City is a corporation. As such, it's subject to New York State General Business ("GBS") Law §349 that includes the following terms:

> "Deceptive acts and practices unlawful. (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

3. New York GBS §349(h) allows individuals to pursue a civil action for violations of New York GBS §349 that they experience.

4. The information that I have discussed in this pleading confirms that Defendants Defendants City of New York, Bill de Blasio, Berkowitz, Gerola, Nieves, Ramos, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, and NYPD John Doe2 7/12/17 are liable for violations of New York State General Business Law 349 that occurred in relation to my efforts to have attended the Mayor's 7/12/17 town hall.

**CLAIM #15:**                                    **Negligence**

**(Against All Defendants)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. While taking their oath of office to work for the City of New York, each person who is a defendant with causes of action asserted against them through this pleading needed to have pledged that they would perform their duties as personnel of the City of New York in accordance with the U.S. Constitution. However, the information that I have discussed in this pleading confirms that they instead violated 42 U.S.C. §1986 by having committed illegal acts and omissions in relation to my efforts to have attended the Mayor's 7/12/17 town hall.

3. Also, though all members of the NYPD have a Fourteenth Amendment affirmative legal duty
   to intervene to prevent and end unconstitutional practices that they observe and receive
   information about, the defendants who were members of the NYPD on 7/12/17 neglected do
   so in relation to my efforts to have attended the Mayor's 7/12/17 town hall.

4. The information that I have discussed in this pleading confirms that all of the defendants that
   this pleading concerns are liable for acts of negligence that occurred in relation to my efforts
   to have attended the Mayor's 7/12/17 town hall.

**CLAIM #16:**                                   **Municipal Liability**

**(Against Defendant City of New York)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set
   forth herein.

2. I have established in this pleading that unofficial illegal policies, customs, and practices that
   had the force of law were maintained against me in relation to my efforts to have attended the
   Mayor's 7/12/17 town hall through the illegal acts and omissions that the defendants
   committed against me individually and as part of a collaborative conspiracy in furtherance of
   an abuse of process that was designed to violate my civil rights by preventing me from
   attending the Mayor's 7/12/17 town hall. I have also established that the unofficial illegal
   policies, customs, and practices that had the force of law and were maintained against me in
   relation to my efforts to have attended the Mayor's 7/12/17 town hall were condoned by
   Defendants O'Neill, Redmond, Carrion, Stribula, Ramos, Nieves, Gerola, and Berkowitz.

3. The unofficial illegal policies, customs, and practices that had the force of law and were
   committed against me on 7/12/17 in relation to my efforts to have attended the Mayor's
   7/12/17 town hall were inextricably intertwined with the similar illegal acts and omissions

that were committed against me that prevented me from attending the Mayor's 6/8/17 town hall, 5/23/17 resource fair, and 4/27/17 town hall.

4. The fact that though I reported multiple entirely valid complaints to the CCRB, IAB, DOI, and Judge Bannon between 4/27/17 and 7/12/17 about the illegal acts and omissions that were committed against me on 4/27/17, 5/23/17, and 6/8/17 in relation to my efforts to have attended the Mayor's 4/27/17 town hall, 5/23/17 resource fair, and 6/8/17 town hall, no one took appropriate corrective action in response to enable me to attend the Mayor's 7/12/17 town hall is sufficient to establish that the illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 4/27/17 town hall, 5/23/17 resource fair, and 6/8/17 town hall were illegally condoned by the CCRB, IAB, and DOI.

5. The preceding facts are sufficient to allow me to prevail with my municipal liability claims that this pleading concerns.


**CLAIM #17:**       **Intentional and Negligent Infliction of Emotional Distress**

**(Against All Defendants)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Through the illegal acts and omissions that the defendants committed against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall, they subjected me to intentional and negligent infliction of emotional distress that I experienced mainly in the form of seething rage, frustration, and stress that I kept in check, stress, and humiliation from having been unjustly stigmatized by their illegal acts and omissions that occurred in full view of members of the general public and others.

3. Through body language that I clearly exhibited and remarks that I made to Defendants

Berkowitz, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, Baez,

Gerola, Nieves, and Lance on 7/12/17 at the site of the Mayor's 7/12/17 town hall, I made

them fully aware of the fact that their illegal acts against me then were causing me to

experience emotional distress mainly in the form of frustration, stress, and justifiable anger.

Despite having been aware of that, they willfully, callously, and wantonly made no attempt

to change their behavior to enable me to attend the Mayor's 7/12/17 town hall. These facts as

well as the fact that the other individual defendants that this pleading concerns were part of a

conspiracy to illegally prevent me from attending the Mayor's 7/12/17 town hall and

otherwise condone illegal acts committed against me at public forums that the Mayor

conducted are sufficient to enable me to prevail with claims for intentional infliction of

emotional distress against all of the defendants that this pleading concerns.

**CLAIM #18:**            **Conspiracy to Violate Civil Rights and**
                          **Cover-Up Such Abuse**

**(Against Defendants City of New York, O'Neill, Redmond, Berkowitz, Gerola, Nieves, Ramos, Stribula, Cruz, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, NYPD Officer Lance, Carrion)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.  The information that I have discussed in this pleading confirms that Defendants identified

    above that this cause of action is asserted against are liable for having been part of a

    conspiracy in which its members committed illegal acts and omissions against me in relation

    to my efforts to have attended the Mayor's 7/12/17 town hall.

**CLAIM #19:**                     **Unjust Enrichment**

**(Against Defendants Bill de Blasio, O'Neill, Redmond, Berkowitz, Gerola, Nieves, Ramos,**

**Stribula, Cruz, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, NYPD Officer Lance, Carrion)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. In spite of the fact that Defendants Redmond, Berkowitz, Gerola, Nieves, Ramos, Stribula, Cruz, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, NYPD Officer Lance, Carrion committed illegal acts and omissions in relation to my efforts to have attended the Mayor's 7/12/17 town hall, all of those defendants were enriched at my expense by having received compensation during the times that they were committing illegal acts and omissions against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall.

3. Defendant Bill de Blasio was unjustly enriched in spite of the fact that he failed to live up to his duty to have sufficient safeguards in place to **a)** prevent members of the NYPD and his staff from illegally preventing me from attending his 7/12/17 town hall and **b)** have all members of the NYPD immediately and decisively intervene on my behalf on 7/12/17 in response to violations of my constitutional rights to attend that town hall that occurred in their immediate presence and that they were otherwise notified about by me on 7/12/17.

4. In spite of the fact that I told Defendant O'Neill on 6/26/17 about illegal acts and omissions that were committed against me on 4/27/17 and 5/2/17 by members of the NYPD and others at the sites of public forums that the Mayor conducted, he illegally didn't take appropriate corrective action to prevent further and similar such crimes from being committed against me at subsequent and similar public forums that the Mayor conducted. I continued to have illegal acts and omissions committed against me at the sites of public forums that the Mayor conducted following 6/26/17 partly due to Defendant O'Neill's failure to take appropriate

and decisive corrective action about that. Mr. O'Neill was enriched at my expense by having received compensation that spanned the times during which illegal acts and omissions were committed against me in relation to my efforts to have attended the Mayor's 7/12/17 town hall.

5. Defendants Redmond, Berkowitz, Gerola, Nieves, Cruz, Baez, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, and NYPD Officer Lance were unjustly enriched in spite of the fact that they engaged in official misconduct in violation of their oath of office as employees of the City of New York, NYPL §195.00, New York City Charter §1116, NYPL §240.26, and other applicable laws as they didn't perform their legal duty to have done the following work that is discussed in Section 435 of the New York City Charter in regards to me and my efforts to have attended the Mayor's 7/12/17 town hall:

   a. "Preserve the public peace, prevent crime, detect and arrest offenders" with respect to those who illegally prevented me from attending the Mayor's 7/12/17 town hall.

   b. "Disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public" "places; protect the rights of persons and property".

   c. "Preserve order at" "all public meetings and assemblages".

   d. "Remove all nuisances in the public" "places".

   e. "Enforce and prevent the violation of all laws and ordinances in force in the city; and for these purposes to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses."

6. Defendants Ramos, Stribula, Jane Doe 7/12/17, and Carrion were unjustly enriched in spite of the fact that they engaged in official misconduct in violation of their oath of office as employees of the City of New York, NYPL §195.00, New York City Charter §1116, NYPL

§240.26, and other applicable laws as they didn't perform their legal duty to have done the

following in regards to me and my efforts to have attended the Mayor's 7/12/17 town hall:

    a.  Make certain that I would be able to exercise my constitutional rights to attend the

        Mayor's 7/12/17 town hall.

    b.  Make certain that no one subject to their control and/or supervision would interfere

        with my ability to exercise my constitutional rights to attend the Mayor's 7/12/17

        town hall.

**CLAIM #20:**                        **Public and Private Nuisance**

**(Against All Defendants)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2. For the reasons that I have discussed in this pleading and are supported by findings in

    *Cangemi v. US*, No. 12-cv-3989 (JS)(SIL) (E.D.N.Y. Mar. 31, 2017), the defendants against

    whom I am asserting claims in this pleading committed both a private nuisance against me

    and a public nuisance against both others and I by having committed illegal acts and

    omissions in relation to my efforts to have attended the Mayor's 7/12/17 town hall. My

    claims about the defendants having committed a public nuisance largely stem from the fact

    that I sought to engage in protected whistleblowing during the Mayor's 7/12/17 town hall as

    a speaker and by distributing literature containing whistleblowing information, both of which

    were and otherwise would have been against the Mayor, Mr. Banks, HRA, HRA's business

    partners, the Bronx DA, DOI, HPD, NYPD, Judge Bannon, OTDA, and other judges to

    directly and indirectly provide information to large numbers of the public partly through

    word-of-mouth advertising to facilitate the public's ability to make informed decisions about

why they should engage in voting and otherwise support the campaigns of the Mayor's rivals

in the 2017 New York City government elections to fire the Mayor, the Mayor's

administration, and exert sufficient pressure on the NYPD to have NYPD defendants in this

action to be fired and prosecuted for civil rights crimes that they directly committed against

me and indirectly committed against the public in the process by having illegally prevented

me from attending the Mayor's 7/12/17 town hall, the Mayor's 6/8/17 town hall, the Mayor's

5/23/17 resource fair, and the Mayor's 4/27/17 town hall.

## DEMAND FOR A JURY TRIAL

1. I demand a trial by jury in this action on each and every one of my damage claims.

## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me

additional relief by:

1. Causing this Court to immediately, diligently, and consistently uphold its legal duty to be an
   impartial fact-finder in this action that pays proper attention to every detail in this case.

2. Causing this Court to fully and consistently articulate credible reasons with particularity in
   every single order and memo endorsement it issues in this action.

3. Causing this Court to refrain from making premature and prejudicial assumptions that may
   be disproven by discovery and other research and cause me to have further justifiable animus
   against this Court largely because of its bias, prejudice, and incompetence in violation of my
   due process rights.

4. Causing this Court to belatedly and immediately grant me declaratory, equitable, and
   injunctive relief pursuant to 28 U.S.C. §2201, FRCP Rule 42, 28 U.S.C. §1367, the

exceptions to the Younger Abstention doctrine, ex Parte Young, and my First and Fourteenth

Amendment rights to have access to the courts by issuing an order that causes my HRA

lawsuit to be immediately reinstated after it was repeatedly and materially conducted in bad

faith by the judges assigned to it that resulted in it having been illegally dismissed 3 times as

a result of flagrant judicial misconduct before it was reinstated twice. Concerning the

exceptions to the Younger Abstention doctrine, the fact that my HRA lawsuit was reinstated

twice is among other factors that firmly establishes that the judges assigned to it conducted it

in bad-faith that amounted to harassment of me and caused me substantial injury. My HRA

lawsuit has been comprised of claims that are parallel to this action insofar as my 4/27/17

claims in this case are concerned. New York State Supreme Court Judge Lyle Frank illegally

deprived me of my due process right to participate in an oral arguments hearing remotely that

was scheduled to be conducted on 2/26/20 in my HRA lawsuit while I was recovering from a

severe and extremely vexing illness that caused me to suffer from symptoms that were

closely related to the Coronavirus that I had been suffering from for nearly 2 months and met

with 3 doctors about as they prescribed me medicine that I was still taking on and after

2/26/20. Judge Frank also illegally refused to adjourn that oral arguments hearing in violation

of my due process rights to be heard at a meaningful time in a meaningful way that was

tailored to my circumstances and capacity to be heard. He also lied about material matters of

fact in a decision that he issued on 2/26/20 in my HRA lawsuit through which he fraudulently

dismissed that case.

5. Causing this Court to belatedly and immediately grant me related declaratory, equitable, and

injunctive relief by causing this Court to immediately issue an order that exercises complete

control over my HRA lawsuit and consolidates it with this action in the interests of judicial

economy that pertains to a common nucleus of operative facts, claims, and defendants that has existed between my HRA lawsuit and my claims in this action.

6. Empaneling a jury to hear and decide this case strictly on its merits.

7. Granting me the following additional relief against the defendants individually and jointly:

    a. Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

    b. Declaratory, equitable, and injunctive relief that pertain to the legal remedies that 18 U.S.C. §1964 entail by ordering the following to immediately occur:

        i. The dissolution of the Mayor's administration for whose benefit as well as her own Defendant Ramos committed multiple acts of wire fraud against me that caused financial harm to me as well as others (namely those who voted against the Mayor in 2017).

        ii. Treble damages to be awarded to me.

        iii. A special election to be promptly held to replace the Mayor's administration in which those who have been members of the Mayor's administration since April of 2017 will be barred from consideration.

    c. Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted

by voter fraud and voter suppression that occurred partly by illegally:

    i. Preventing whistleblowers from attending public forums that the Mayor conducted with them and were partly used as campaign events to attract various types of support from voters and prospective voters.

    ii. Segregating and discriminating against whistleblowers at such public forums.

    iii. Concealing critically significant video recordings that were recorded:

        1) As a result of arrangements that the Mayor's office made for how those public forums were being conducted from within the rooms in which they were being conducted. Such concealment was that of a public record and illegally deprived voters, prospective voters, political rivals, journalists, and those who finance political campaigns of relevant information that amounted to voter fraud, voter suppression, and whistleblower retaliation.

    iv. Causing video recordings that were recorded by DOE's 4/27/17 video prior to 6:30 pm on 4/27/17 and video recordings that were recorded on 5/23/17 inside of the BSC by a video security camera controlled by OCA to have been illegally not preserved and provided to me. Both of those video recordings recorded illegal acts that were committed by members of the Mayor's NYPD security detail and others that caused me to have been illegally prevented from attending the Mayor's 5/23/17 resource fair and 4/27/17 town hall.

d. Declaratory, injunctive, and equitable relief in accordance with findings expressed in *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) through the issuance of an order that enjoins Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

e.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

    i.  Prohibits all members of the NYPD from deliberately making any physical contact with me while I am conducting myself in a lawful manner.

    ii.  Requires all members of the Mayor's NYPD security detail to not come within 10 feet from me while they are on-duty as members of the Mayor's NYPD security detail and I am conducting myself in a lawful manner, unless I explicitly grant consent for that to occur.

    iii.  Requires all members of the Mayor's CAU to not come within 10 feet from me while I am conducting myself in a lawful manner and they are on-duty as members of the Mayor's CAU, unless I explicitly grant consent for that to occur.

    iv.  Prohibits Defendant City's personnel from illegally interfering with my ability to attend public forums that the Mayor may conduct from within the room in which he does so as he does so.

    v.  Prohibits Defendant City's personnel from illegally interfering with the rights that other people have to lawfully attend public forums that the Mayor conducts that may allow others and I to exercise our First Amendment right to observe, hear, and enjoy lawful speech and other expression that such people may engage in to criticize the Mayor and others during them.

    vi.  Prohibits Defendant City's personnel from illegally interfering with the First Amendment and Fifth Amendment rights that people have to **a)** bring literature and signs with them into rooms in which the Mayor conducts public forums, **b)**

lawfully distribute such literature during those meetings without disrupting those meetings, **c)** distribute such literature and otherwise show it and signs in the rooms in which the Mayor conducts such meetings before they begin and after they end, and **d)** Keep such literature and signs with them as the Mayor conducts such public forums.

vii. Requires Defendant City to grant access to public forums that the Mayor conducts inside of buildings based on the order in which members of the public line up directly outside of those buildings shortly before those meetings begin to be granted access to the room in which the Mayor conducts such public forums on those dates.

viii. Prohibits Defendant City from allowing its personnel to prevent members of the public from attending public forums that the Mayor conducts inside of buildings from within the rooms in which he does so while sufficient seating is available in those rooms.

ix. Orders Defendant City to immediately cause all members of the NYPD who are present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe to wear body-cameras that are always on and always recording both audio and video recordings.

x. Orders Defendant City of New York to provide all audio and video recordings from such body-cameras in unedited and non-redacted form along with their audit trail records to allow for an independent forensic analysis within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)**

the members of the NYPD wearing those body-cameras.

xi.   Orders Defendant City to immediately **a)** cause clear audio recordings to be recorded of all verbal communications that members of the NYPD have while they are on-duty as members of the NYPD and present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe.

xii.   Orders Defendant City of New York to provide all such audio recordings in unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD heard in those audio recordings while they are being recorded.

xiii.   Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted communications) that are engaged in by those who are part of the Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv.   Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the

extent that those communications concern those adverse encounters.

xv. Orders Defendant City to provide me copies of all communications that its

personnel have had about me since 2/1/16 in unedited and non-redacted form.

This includes, but is not limited to all of the following:

1) The e-mail messages that appear in the 374-page PDF file with redactions

that I sufficiently identified between pages 3 and 9 in the legal filing that I

filed in this case on 3/6/20 that was addressed to Judge Gorenstein.

2) The e-mail messages that I received from Ms. Faddis on 2/18/20 and

were sent by Ms. Stribula on 4/27/17 at 2:46 pm, 7/12/17 at 2:47 pm,

and 9/14/17 at 3:43 pm.

3) All communications that have taken place by using personally-owned

devices, personal e-mail accounts, personal encrypted messaging

accounts, and personal cell phone plans as well as by using computers

and other devices that are owned or leased by Defendant City and e-

mail, cell phone, and encrypted messaging accounts that are

administered and/or controlled by Defendant City.

f. Further declaratory, injunctive, and equitable relief through the immediate issuance of an

order that:

i. Orders Defendant City to immediately cause the CCRB and DOI to be provided

all video recordings within 24 hours after a complaint is reported to them about

illegal acts and omissions that are committed by members of the NYPD and

other personnel of Defendant City that are recorded by video security cameras

that Defendant City controls. This includes, but is not limited to illegal acts that

are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

ii. Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

iii. Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the Mayor's 7/12/17 town hall and that they are prohibited from being employed by Defendant City again:

> Defendants de Blasio, O'Neill, Redmond, Berkowitz, Gerola, Nieves, Ramos, Stribula, Cruz, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, Lance, Marco Carrion

iv. Orders Defendants Bill de Blasio, O'Neill, Redmond, Berkowitz, Gerola, Nieves, Ramos, Stribula, Cruz, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, NYPD Officer Lance, and Carrion to immediately and fully reimburse those who were their employers on and after 7/12/17 with pre-judgment and post-judgment interest for the total value of pay and benefits that they received that directly correspond to the length of time during which they were involved in the illegal acts and omissions that were committed against me in relation to **a)** my efforts to have attended the Mayor's 7/12/17 town hall and **b)** the cover-up of those illegal acts and omissions by

Defendant Ramos.

v.   Restrains Defendant City's personnel and agencies from continuing to commit
illegal acts and omissions against me that violate my rights, especially in all
areas that are public forums.

vi.   Declares that the ban that the Mayor announced that prohibits large gatherings
of people in New York City and protests from being conducted is overly broad,
pretextual, void, and unenforceable largely because it impermissibly violates
core First Amendment rights as well as Fifth Amendment and Fourteenth
Amendment rights that pertain to due process, selective-enforcement, equal
protection, and liberty. As a reminder, that ban is certainly related by what it
entails to the illegal practice that was imposed upon me without due process of
what certainly was social-distancing between where I was on **a)** 7/12/17, 6/8/17,
5/23/17, and 4/27/17 and **b)** where members of the public and others were as
they attended the Mayor's 4/27/17 town hall, 5/23/17 resource fair, 6/8/17 town
hall, and 7/12/17 town hall within the rooms in which they were conducted as
they were conducted.

vii.   Further declares that though it may possibly be advisable to wear a face mask
in New York City, no one is required to do so partly because doing so impedes
the flow of oxygen to healthy people and impermissibly infringes upon the First
Amendment rights that people have to engage in freedom of expression, such as
by having people see them smiling, expressing affection by kissing, being able
to yawn without having to wear a face mask, and having other facial
expressions that they make seen by others. Although it is potentially dangerous

to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors. Moreover, many members of the NYPD's mob have been caught ignoring the policy that has required them to wear face-masks during the ongoing Coronavirus pandemic.

    viii.   Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed as well as due to the fact that numerous protests have recently been taking place across New York City in the immediate presence of members of the NYPD in which social-distancing rules have been openly defied by members of the NYPD and others.

    ix.   Further declares that the social-distancing restrictions in New York City have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

g.  Declaratory relief by declaring that the Mayor's 7/12/17 town hall was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken as a result of that public forum having been conducted are void pursuant to Section 107 of New York State's Public Officer Law because the Mayor's 7/12/17 town hall was conducted in violation of New York State's Open Meetings Law.

h.  Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

i. Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that hosted the Mayor's 7/12/17 town hall between the time when **a)** the first member of the public entered that building on 7/12/17 in relation to attending that town hall and **b)** everyone who attended the Mayor's 7/12/17 town hall exited that building.

ii. Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally prevented from attending the Mayor's 7/12/17 town hall.

iii. Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued for the Mayor's 7/12/17 town hall and are similar to the e-mail message that Ms. Stribula sent on 4/27/17 at 2:46 pm that Ms. Faddis provided to me.

iv. Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 7/12/17 town hall as well as the names and contact information for the journalists who attended the Mayor's 7/12/17 town hall.

i. Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/19/20 by all video security cameras that were installed in the school and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on

that date between the times when the first member of the public was allowed into that
school for the purpose of attending that town hall until everyone who attended that town
hall exited that school.

j.   Compensation for all costs and attorney fees that are related to my pursuit of this civil
action.

k.   An award of damages against Defendants James O'Neill, Redmond, Berkowitz, Gerola,
Nieves, Ramos, Stribula, Cruz, Baez, Jane Doe 7/12/17, NYPD John Doe1 7/12/17,
NYPD John Doe2 7/12/17, Lance, and Carrion pursuant to 18 U.S.C. §1986 for having
not intervened on my behalf in relation to my effort to have attended the Mayor's 7/12/17
town hall.

l.   An award of damages against defendants Defendants Bill de Blasio, James O'Neill,
Redmond, Berkowitz, Gerola, Nieves, Ramos, Stribula, Cruz, Baez, Jane Doe 7/12/17,
NYPD John Doe1 7/12/17, NYPD John Doe2 7/12/17, Lance, and Carrion pursuant to
New York State General Business Law §349 for deception in relation to my efforts to
have attended the Mayor's 7/12/17 town hall, remarks that the Mayor made as he
conducted that town hall, remarks that Mr. O'Neill made to me on 6/26/17 by telling me
that he would need to talk with Mr. Redmond about what I discussed with Mr. O'Neill
then, and how some of those defendants conducted themselves as criminal accomplices
instead of the law-enforcement personnel that they technically were throughout July of
2017.

m.   An award of punitive damages for all of my claims set forth in this pleading.

n.   An award of pre-judgment and post-judgment interest.

o.   Such other, further, and different relief as the interests of justice and equity may require.

Dated:          New York, New York
                July 17, 2020

                                              From,


                                              s_/Towaki Komatsu

                                              *Plaintiff, Pro Se*
                                              802 Fairmount Pl., Apt. 4B
                                              Bronx, NY 10460
                                              (347) 872-1205